315 Ga. 408
FINAL COPY

S22A0891. THE STATE v. KENNEY.

COLVIN, Justice.

A Fulton County grand jury indicted Michael Jerome Kenney for malice murder and related offenses in connection with the shooting death of Laquitta Brown ("Laquitta").[1] Before trial, Kenney moved in limine to exclude hearsay statements that Sharrie Dixon, a witness present during the shooting who was unavailable to testify at trial, allegedly made to Aisha Brown ("Aisha"), Laquitta's partner.[2] In response, the State filed a notice of intent to admit Dixon's statements to Aisha under OCGA § 24-8-807, also known as "the residual exception" or "Rule 807," which provides

---

[1] Laquitta died on February 10, 2018. The grand jury returned an indictment on July 20, 2018, charging Kenney with malice murder (Count 1), felony murder (Counts 2, 3, and 4), aggravated assault (Count 5), possession of a firearm during the commission of a felony (Count 6), and possession of a firearm by a convicted felon (Counts 7 and 8).

[2] Dixon died in an unrelated incident several weeks after Laquitta's shooting.

that, if certain conditions apply, "[a] statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule." The court construed the State's notice as a motion to admit Dixon's statements. Then, finding that the State had failed to establish exceptional guarantees of trustworthiness, the court granted Kenney's motion in limine and denied the State's construed motion to admit Dixon's statements. The State timely appealed under OCGA § 5-7-1 (a) (5) (permitting the State to appeal "[f]rom an order . . . excluding any other evidence to be used by the state at trial").

On appeal, the State argues that the trial court abused its discretion in excluding Dixon's statements because the statements were admissible under OCGA §§ 24-8-803 (1) (present sense impression), 24-8-803 (2) (excited utterance), and 24-8-807 (the residual exception). We conclude, however, that the State affirmatively waived its present-sense-impression and excited-utterance arguments and that the court was authorized to conclude that Dixon's statements were inadmissible under the residual

2

exception.  Accordingly, we affirm.

1.     At a hearing on Kenney's motion in limine, the trial court reviewed two recorded statements Aisha gave to investigators after Laquitta's death, in which Aisha provided the following description of events.[3]  On Friday, February 9, 2018, Dixon and Kenney were hanging out at the Browns' townhome in East Point, Georgia.[4] Dixon had been staying with the Browns since the day before, when she called Aisha saying she had just returned from Florida and needed somewhere to stay for the night.[5]  Laquitta, who had known Kenney for over 15 years, had invited Kenney to stay with them that night because he was having relationship problems with the mother of his children.

While the four of them were drinking, dancing, and playing

---

[3] Aisha's interviews occurred on February 10 and July 12, 2018.

[4] Aisha and Dixon knew Kenney as "Jones."  For clarity, references to "Jones" in this opinion, including references to "Jones" that appear within quotations from Aisha and Dixon, have been replaced with "Kenney."

[5] An investigator's written summary of Aisha's first recorded interview stated: "Ms. Brown stated that [Dixon] was someone who stayed in the area and sometimes she hung out in the apartment or stayed a few days when she was in the area.  Ms. Brown said she considered [Dixon] a friend who liked to have a good time."

cards in Aisha's upstairs bedroom, Aisha and Dixon saw that Kenney had a gun in his waistband. Dixon, who had lost her son to gun violence, asked Kenney to put the gun away. Kenney complied, sliding it under the bed.

Around 1:00 or 2:00 a.m. on February 10, Aisha took pain medication for a sprained ankle. The medication "knocked [her] out," and she fell asleep. Sometime after 5:00 a.m., however, a loud argument between Laquitta and a "gentleman" downstairs awakened Aisha, who found Dixon sitting on her bed.

As relevant to Kenney's motion in limine, Dixon told Aisha that, while Aisha was sleeping, Dixon and Kenney had driven to Kenney's mother's house.[6] Dixon further said that Kenney had been crying, had loaded his gun, and had said that he was going to kill the mother of his children and the kids. Aisha, who could hear Laquitta telling Kenney "it's not worth it" and "calm down," asked Dixon to check on Laquitta for her, since Aisha's ankle was injured.

---

[6] According to the State's factual proffer, Dixon and Kenney had gone out to buy more beer, and unopened beer cans were later found in Aisha's bedroom.

4

But Dixon refused, saying that Kenney had a loaded gun and had been talking about killing his family. Aisha then heard three gunshots.

Aisha ran downstairs and found Laquitta lying dead on the ground with a gunshot wound to her head. She called 911. While speaking to dispatch, Aisha said she heard "[Kenney], the guy who shot and killed [her] girl," outside yelling obscenities.

In addition to Aisha's recorded statements, the trial court considered additional evidence, which showed the following. An officer who responded to the scene spoke with Aisha and prepared a report documenting her statements. As relevant to Kenney's motion in limine, the officer's report stated that Aisha told the officer that she heard gunshots and then heard Dixon shout, "[Kenney]! Just shot Laquitta!"

Although Dixon was too intoxicated to give a statement at the scene, she provided a recorded statement to law enforcement officers

several hours later.[7]  In her statement, Dixon said that she sometimes stayed with the Browns when she was in the area.  She further said that she had left the apartment to get more beer with Kenney that night and that, while out, Kenney had loaded a gun and said he was going to kill the mother of his children and the kids.  According to Dixon, when they returned to the apartment, Laquitta grabbed the keys from Kenney's hand and the two of them argued in the kitchen while Dixon went upstairs.  After hearing three shots, Dixon said, she went downstairs with Aisha and found Laquitta dead on the floor.

Sometime later, an officer presented Aisha and Dixon with photo lineups that included Kenney.  Although Aisha identified Kenney, Dixon was unsure if she knew anyone in the lineup.

About three weeks after Laquitta's death, Dixon was stabbed to death in an unrelated incident.  When asked during her second

---

[7] The record includes only an investigator's summary of Dixon's interview, and the State conceded that Dixon's statements to the investigator were inadmissible under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

recorded interview what she knew about Dixon's death, Aisha said only that Dixon had been at her house the day before she died and that Dixon's daughter had called her on the morning of Dixon's death to see if Aisha knew Dixon's whereabouts.

Kenney argued that the court should exclude the statements Dixon allegedly made to Aisha just before the shooting. Specifically, Kenney sought to exclude Dixon's statements that Dixon and Kenney had temporarily left the Browns' townhome; that, while they were out, Kenney had loaded a gun and threatened to kill the mother of his children and the kids; and that Dixon did not want to go downstairs to check on Laquitta because Kenney had a loaded gun and had been talking about killing his family. Kenney also argued that the court should exclude the statement Dixon allegedly made to Aisha after hearing the gunshots, namely, that "[Kenney]! Just shot Laquitta!"

The court granted Kenney's motion in limine and denied the State's construed motion to admit Dixon's statements to Aisha, finding that "the State fail[ed] to show that there [were] exceptional

7

guarantees of trustworthiness surrounding [Dixon's] declaration[s]" and thus that Dixon's statements were inadmissible under the residual exception to the hearsay rule. The court found "no evidence that a close relationship between Ms. Dixon and Ms. Aisha Brown existed that would guarantee the trustworthiness of the statements" because "there was no evidence presented as to how Ms. Aisha Brown, or any of the other parties involved that evening, knew Ms. Dixon, how long they had known her, or the closeness of her relationship to any of the residents," and "Ms. Aisha Brown's recorded interviews did not indicate that Ms. Dixon was anything more than a passing acquaintance." The court further found that there were no circumstantial guarantees of trustworthiness "equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history." Finally, the court noted that Dixon was "under the influence of alcohol and/or other substances" when she made the statements to Aisha, that officers had to "delay[ ] getting Ms. Dixon's statement due to her state of

8

inebriation," and that, "despite having spent an entire night in [Kenney's] company, Ms. Dixon had difficulty identifying him in a line up."

2. The State argues that the trial court abused its discretion in excluding Dixon's hearsay statements because they were admissible as present sense impressions, under OCGA § 24-8-803 (1) ("Rule 803 (1)"), and excited utterances, under OCGA § 24-8-803 (2) ("Rule 803 (2)").[8] This claim of error fails, however, because, as explained below, the State affirmatively waived admission of Dixon's hearsay statements under those exceptions. See *Dukes v. State*, 311 Ga. 561, 569 (3) (858 SE2d 510) (2021) ("[A]ffirmative waiver . . . prevents reversal." (citation and punctuation omitted)).

---

[8] Although OCGA § 24-8-802 ("the hearsay rule") provides that hearsay statements are generally inadmissible, present sense impressions and excited utterances "shall not be excluded by the hearsay rule." OCGA §§ 24-8-803 (1) (defining a "present sense impression" as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter"); 24-8-803 (2) (defining an "excited utterance" as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition").

9

After Kenney filed the pretrial motion in limine to exclude Dixon's statements to Aisha, the State filed a notice of intent to admit Dixon's statements under the residual exception to the hearsay rule (Rule 807), which provides in relevant part:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
> (1) The statement is offered as evidence of a material fact;
> (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

OCGA § 24-8-807. In its notice, the State indicated that "[t]he State will offer this evidence pursuant to the Residual Exception to the Hearsay Rule" and argued that "[t]he [s]tatements made by Dixon to Aisha Brown meet the certainties of reliability required of residual hears[a]y admission under OCGA § 24-8-807."

Likewise, at the motion-in-limine hearing, the State argued that Dixon's statements were admissible under the residual

10

exception (Rule 807).  Citing our decision in *State v. Holmes*, 304 Ga.
524 (820 SE2d 26) (2018), the State argued that, in assessing
whether Dixon's statements were trustworthy under Rule 807, the
court needed "to look to the other reasons for the admissibility of
hearsay under [the Rule] 803 [exceptions]," including the present-
sense-impression and excited-utterance exceptions.  See *Holmes*,
304 Ga. at 530 (2) (a) (holding that the trial court abused its
discretion in admitting a hearsay statement "under the residual
exception without considering whether this was an exceptional
circumstance in which the guarantees of trustworthiness were the
equivalent to those found in the other statutory exceptions to
hearsay set forth in Rules 803 and 804 of Georgia's Evidence Code").
The State further said that, under *Holmes*, "you need to look at both,
you know, the [Rule] 804 exceptions [where] the declarant was
unavailable, as well as [Rule] 803.  I believe I cited those: the present
sense[ and] the excited utterance [under Rules 803 (1) and (2)]."

Assuming without deciding that the State's references to Rules
803 (1) and (2) constituted arguments that Dixon's hearsay

11

statements were independently admissible as present sense impressions and excited utterances, the State affirmatively waived admission of Dixon's statements under those exceptions later in the hearing.[9]  See *Davis v. State*, 311 Ga. 225, 230 (2) (857 SE2d 207) (2021) ("To constitute an affirmative waiver, [a claim of] error must have been intentionally relinquished or abandoned."  (citation and punctuation omitted)).[10]  Specifically, in explaining why Dixon's statements were admissible under the residual exception (Rule 807), the State argued:

> In fact, what the case law shows is that these statements come in quite frequently.  But compared to other exceptions and other avenues for the admission of

---

[9] To the extent that the logic of the special concurrence suggests that a party's statement cannot constitute an affirmative waiver of an argument if the statement was "part and parcel of," or was "made only in service of," another argument, we disagree.  See, e.g., *Dukes*, 311 Ga. at 569 (3) (holding that defense counsel's statement that a witness was not qualified to give further testimony on an issue, which defense counsel only made in service of an argument that the court should not strike other testimony from the witness, affirmatively waived an argument on appeal that the court should have permitted further testimony).

[10] "[W]e have contrasted [an affirmative] waiver — the intentional relinquishment of a known right — with 'forfeiture,' which is the mere 'failure to make the timely assertion of the right.'"  *Grullon v. State*, 313 Ga. 40, 46 (2) (a) (867 SE2d 95) (2021) (citations and punctuation omitted).  Whereas affirmative waiver precludes appellate review, we ordinarily review forfeited evidentiary arguments for plain error under OCGA § 24-1-103 (d).  See *Griffin v. State*, 309 Ga. 860, 864-865 (2) (849 SE2d 191) (2020).

this evidence, it's quite rare. It is rare. And I think what you have to look at making it rare is that you've got to exhaust all other options of admissibility. And we've done that here. *We can't use, you know, [Rule] 803 by itself because obviously the declarant in this is deceased, so she'd be unavailable [to] testify.*

(Emphasis supplied.) The State then argued that the statements were inadmissible under the hearsay exceptions contained in OCGA § 24-8-804 ("Rule 804"), stating, "The defendant didn't cause the death [of Dixon], . . . [s]o that really takes us out of the realm of [Rule] 804 exceptions." See OCGA § 24-8-804 (b) (5) (providing that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is excepted from the rule against hearsay). Finally, the State concluded by saying, "And so we've exhausted everything."

In context, then, the statement that "[w]e can't use . . . [Rule] 803 by itself" showed not only that the State was aware of Rules 803 (1) and (2) but that the State intentionally conceded, perhaps

13

unwisely,[11] that Dixon's hearsay statements were inadmissible under those exceptions in an effort to show that they were "statement[s] not specifically covered by any law." OCGA § 24-8-807. See *Blackmon v. State*, 306 Ga. 90, 94 (2) n.3 (829 SE2d 75) (2019) (noting that the trial court erred in concluding that hearsay statements "were admissible under both the excited utterance exception and the residual exception" because "[t]he residual exception applies . . . only to statements not specifically covered by any law," and "[t]hus, if the hearsay statements at issue were admissible under the excited utterance law, they were not admissible under the residual exception" (citation and punctuation omitted)). By conceding that the State "can't use . . . [Rule] 803 by itself" to admit Dixon's statements, the State affirmatively waived any argument that Dixon's statements were independently

_____

[11] We note that the State's representation that Dixon's hearsay statements could not be admitted under Rule 803 because she was unavailable to testify reflects an apparent misunderstanding of Rule 803, which identifies hearsay exceptions that apply "regardless of whether the declarant is available as a witness." *Grier v. State*, 313 Ga. 236, 244 (3) (d) (869 SE2d 423) (2022) (discussing the excited utterance exception).

14

admissible as present sense impressions or excited utterances.[12] See

*Heade v. State*, 312 Ga. 19, 28 (4) (a) (860 SE2d 509) (2021)

(evidentiary arguments are affirmatively waived if "conceded"

below).  See also *Dukes*, 311 Ga. at 569 (3) (defense counsel

affirmatively waived a claim that the trial court erred "by

prohibiting counsel from further cross-examining the medical

examiner about the effects of amphetamines on a person" because

defense counsel stated at trial that the medical examiner "was not

qualified to give any additional testimony on the topic").  Cf. *Vasquez

v. State*, 306 Ga. 216, 229 (2) (c) (830 SE2d 143) (2019) (withdrawn

arguments are affirmatively waived).

The State contends that, even if it waived admission of Dixon's

hearsay statements under Rules 803 (1) and (2), its arguments on

---

[12] Although it did not do so, the State could have preserved an argument that the hearsay statements were admissible under Rule 803 if, rather than conceding that Rule 803 did not apply, it had argued *in the alternative* that the statements were *either* admissible under Rule 803 *or*, if they were not admissible under Rule 803, then they were admissible under Rule 807.  See *Atkins v. State*, 310 Ga. 246, 249-252 (2) (850 SE2d 103) (2020) (considering on appeal whether the trial court had abused its discretion in concluding that hearsay statements were inadmissible under both the excited-utterance exception and the residual-hearsay exception, where the defendant had argued both exceptions "[i]n the alternative").

appeal that the statements were admissible as present sense impressions and excited utterances are properly before this Court. This is so, the State argues, because a court cannot determine whether evidence is admissible under the residual exception (Rule 807) without "first determin[ing] the evidence's admissibility under other law." For this proposition, the State cites our decisions in *Holmes, Hickman v. State*, 299 Ga. 267 (787 SE2d 700) (2016), and *State v. Hamilton*, 308 Ga. 116 (839 SE2d 560) (2020). We are unpersuaded.

Neither *Holmes* nor *Hickman* held that a court must first determine whether hearsay statements are admissible under another hearsay exception before concluding they are otherwise *inadmissible* under the residual exception. *Holmes* clarified that a court must find that hearsay statements have "guarantees of trustworthiness [that are] equivalent to those found in the other statutory exceptions to hearsay set forth in Rules 803 and 804" before they can be *admitted* under the residual exception. *Holmes*, 304 Ga. at 529-530 (2) (a). As for *Hickman*, we held only that Rule

16

807's requirements for admitting statements under the residual exception were irrelevant to whether evidence could be admitted under another exception because, "[b]y its own terms, OCGA § 24-8-807 does not apply to evidence which is admissible under another exception to the hearsay rule." *Hickman*, 299 Ga. at 272 (4). Neither case required a trial court to perform a specific analysis before concluding that hearsay statements are *inadmissible* under the residual exception.

The same can be said of *Hamilton*.[13] According to the State, because *Hamilton* said that "trial courts should consider whether a specific exception to the hearsay rule applies before *applying* Rule 807," *Hamilton*, 308 Ga. at 124 (3) (b) n.10 (emphasis supplied), a trial court must "first determine that a statement is inadmissible under other law prior to *considering* admissibility under Rule 807." (Emphasis supplied.) This argument, however, misconstrues

_____

[13] Notably, *Hamilton* could not have held that a trial court must perform a specific analysis before concluding that hearsay statements are *inadmissible* under the residual exception because *Hamilton* concluded that the statements at issue were *admissible* under the residual exception. See *Hamilton*, 308 Ga. at 127 (4) (b).

*Hamilton*.

In *Hamilton*, we noted that the trial court had concluded that hearsay statements were alternatively admissible under either OCGA § 24-8-804 (b) (1) ("Rule 804 (b) (1)") or Rule 807. See *Hamilton*, 308 Ga. at 124 (3) (b). Then, after concluding that Rule 804 (b) (1) did not apply, "[w]e caution[ed] that[,] because the residual exception applies *only* to statements not specifically covered by any law, trial courts should consider whether a specific exception to the hearsay rule applies before applying Rule 807." Id. at 124 (3) (b) n.10 (citation and punctuation omitted; emphasis in original). The context surrounding this statement clarifies that we were not saying a court should determine that no other hearsay exception might apply before even *considering* Rule 807, as the State contends. Rather, in context, our statement that "trial courts should consider whether *a specific exception* to the hearsay rule applies before *applying* Rule 807," id. (emphasis supplied), suggested that, when a party argues in the alternative that hearsay statements are admissible under either Rule 807 or another specific hearsay

18

exception, the court should not *admit* the statements under Rule 807 without first determining that the other hearsay exception does not apply.

To summarize, neither *Holmes* nor *Hickman* nor *Hamilton* purported to hold that a trial court must determine that other hearsay exceptions do not apply before concluding for an independent reason that hearsay statements are inadmissible under the residual exception. To the contrary, a court may conclude that statements are inadmissible under the residual exception if the proponent of the evidence fails to establish any one of the preconditions for admitting a statement under Rule 807. See OCGA § 24-8-807 (identifying several preconditions for admission, including that the statement has "circumstantial guarantees of trustworthiness"; "[t]he statement is offered as evidence of a material fact"; "[t]he statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts"; "[t]he general purposes of the rules of evidence and the interests of justice will best be served by

19

admission of the statement into evidence"; and the proponent of the evidence provides adequate notice of intent to admit the statement). This enumeration of error therefore fails.

3. The State argues that the trial court abused its discretion in concluding that Dixon's statements were inadmissible under the residual exception to the hearsay rule (Rule 807) because, according to the State, the trial court (a) improperly relied on case law applying the former Evidence Code, and (b) made several clearly erroneous factual findings. As explained below, although the court should not have relied upon cases applying the former Evidence Code, that error was harmless under the circumstances, and the court did not abuse its discretion in excluding Dixon's statements. See *State v. Stephens*, 307 Ga. 615, 616 (837 SE2d 830) (2020) ("We review the trial court's grant or denial of a motion in limine for abuse of discretion.").

(a) The residual exception to the hearsay rule applies only when "the circumstances under which [the statements] were originally made" establish "exceptional guarantees of

20

trustworthiness." *Rawls v. State*, 310 Ga. 209, 214 (3) (a) (850 SE2d 90) (2020) (citations and punctuation omitted). In assessing whether exceptional guarantees of trustworthiness exist, relevant factors include "the trustworthiness of the original declarant" and whether the circumstantial guarantees of trustworthiness "are equivalent in significance to the specific hearsay exceptions enumerated in Federal Rules of Evidence 803 and 804." *Holmes*, 304 Ga. at 529 (2) (a) (citation, punctuation and emphasis omitted). "[S]uch guarantees must be equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history." Id. (citation and punctuation omitted). "A trial court should consider the totality of the circumstances in determining whether to admit evidence pursuant to OCGA § 24-8-807." *Reyes v. State*, 309 Ga. 660, 668 (2) (b) (847 SE2d 194) (2020).

Although the trial court correctly set out these legal principles governing the admission of hearsay statements under the residual exception, the State contends that the court abused its discretion

21

because, in ruling on whether Dixon's statements were admissible under the exception, it improperly relied on Georgia cases applying the former Evidence Code's "necessity exception" to the hearsay rule.[14] Specifically, the State notes that the trial court cited *Slakman v. State*, 272 Ga. 662 (533 SE2d 383) (2000), and *Navarrete v. State*, 283 Ga. 156 (656 SE2d 814) (2008), both of which addressed the former necessity exception.

We agree that, by citing *Slakman* and *Navarrete* in the context of addressing the residual exception (Rule 807), the trial court violated our admonition in *Reyes* that "[c]ases decided under the 'necessity' exception to the hearsay rule in Georgia's former Evidence Code are . . . not applicable to the interpretation of OCGA § 24-8-807 and should not be relied on by trial courts in determining whether to admit evidence." *Reyes*, 309 Ga. at 666 (2) (a). The

---

[14] Admitting statements under the former necessity exception required the proponent of the evidence to show both "necessity" and "particularized guarantees of trustworthiness." *Navarrete v. State*, 283 Ga. 156, 159 (2) (656 SE2d 814) (2008) (citation and punctuation omitted). The necessity exception "was not carried over into the current Evidence Code" and was instead replaced by Rule 807, which was "modeled . . . on Rule 807 of the Federal Rules of Evidence." *Reyes*, 309 Ga. at 666 (2) (a).

court's error was harmless, however, because it was clear from the court's order that the court "ultimately applied the appropriate evidentiary standard." Id. at 667 (2) (a).

The trial court cited *Slakman* and *Navarrete* only after correctly describing Rule 807's requirements based on controlling authority and after expressly acknowledging that, because "the [Rule] 807 Residual Exception replaced the necessity exception of the old code," former necessity-exception cases no longer controlled. It is true that the trial court erroneously relied on *Slakman* and *Navarrete* to identify relevant factors in assessing the trustworthiness of a statement under Rule 807 — specifically, the closeness of a relationship between a declarant and a hearsay witness, and the intoxication of a hearsay declarant when the statement was made. But because our precedent applying Rule 807 and federal case law applying Rule 807's federal counterpart have likewise identified such factors as relevant to the Rule 807 trustworthiness inquiry, the court's error did not result in the application of an incorrect legal standard. Compare *Slakman*, 272

23

Ga. at 667-668 (3) (b) (1), (2) (closeness of relationships between the declarant and the hearsay witnesses was relevant to trustworthiness under the former necessity exception), with *Rawls*, 310 Ga. at 215 (3) (a) (i) (close relationships provided sufficient guarantees of trustworthiness under Rule 807). Compare *Navarrete*, 283 Ga. at 159-160 (2) (intoxication of declarant when he allegedly made the hearsay statement was relevant to trustworthiness under the former necessity exception), with *United States v. Two Shields*, 497 F3d 789, 794-795 (8th Cir. 2007) ("The district court acted entirely within its discretion in treating Buffalo Boy's extreme intoxication as one consideration in the totality of the circumstances" and "concluding that Buffalo Boy's intoxication diminished the trustworthiness of his statement for purposes of the residual exception to the hearsay rule."). "Because the trial court ultimately applied the appropriate evidentiary standard despite its citation to . . . case[s] construing the former Evidence Code, it is unnecessary for us to vacate the trial court's [order] on this ground." *Reyes*, 309 Ga. at 667 (2) (a).

(b) The State also argues that the trial court clearly erred in making several findings of fact. First, the State challenges the court's finding that there was "no evidence [of] a close relationship between Ms. Dixon and Ms. Aisha Brown . . . that would guarantee the trustworthiness of the statements." According to the State, this finding was clearly erroneous because Aisha called Dixon a friend and a regular houseguest, Dixon had been staying with the Browns for several days when the homicide occurred, Aisha saw Dixon shortly before she died, and Dixon's daughter knew to call Aisha to inquire about Dixon's whereabouts around the time of her death. This argument fails.

The record supports the trial court's finding that "there was no evidence presented as to how Ms. Aisha Brown, or any of the other parties involved that evening, knew Ms. Dixon, how long they had known her, or the closeness of her relationship to any of the residents." Although an investigator's written summary of Aisha's recorded interview stated that Aisha had called Dixon a friend and a regular houseguest, the recording itself does not support these

details. The interview recording reveals that Aisha repeatedly described Dixon only as "the lady downstairs," referring to the downstairs of the police department. She never referred to Dixon as a friend or a regular houseguest, and the trial court was entitled to discredit the investigator's written summary of the recording. See *Daniels v. State*, 313 Ga. 400, 407 (2) (b) (i) (870 SE2d 409) (2022) (noting that courts can "consider facts that definitely can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from audio- or video-recordings" (citation and punctuation omitted)). See also *State v. Rosenbaum*, 305 Ga. 442, 449 (2) (826 SE2d 18) (2019) (noting that, when reviewing a motion-to-suppress ruling, a trial court's "findings based upon conflicting evidence . . . should not be disturbed by a reviewing court if there is any evidence to support them," and "the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous" (citation and punctuation omitted)).

The other evidence on which the State relies to argue that Aisha and Dixon clearly had a close relationship was sparse, in contrast with cases where we have recognized that a close relationship provided circumstantial guarantees of trustworthiness under Rule 807. See, e.g., *Lopez v. State*, 311 Ga. 269, 275 (2) (a) (857 SE2d 467) (2021) (hearsay statements "had the requisite guarantees of trustworthiness" under Rule 807, where the declarant "had a very close relationship with both [witnesses]," as the declarant "had known them for approximately ten years, spoke with them on a daily basis, and was related to [one of the witnesses] by marriage").[15] We therefore cannot say that the trial court clearly

---

[15] See also *Ward v. State*, 313 Ga. 265, 269-271 (3) (a), (b) (869 SE2d 470) (2022) (statements "made to close friends and family, demonstrate[d] sufficient guarantees of trustworthiness under Rule 807," where the hearsay witnesses included a "good friend[ ]" who was "like a big brother to [the declarant]," a "real good friend from college" who "considered [the declarant] like a big sister," the declarant's "best friend," a cousin who was "more like [the declarant's] sister[ ]" and "talked [to the declarant] almost daily," a family member by marriage who "saw [the declarant] at least every other day," and a friend who "grew up in church" with the declarant and had continued to be in a friendship even after college (punctuation omitted)); *Ash v. State*, 312 Ga. 771, 786 (3) (b) (865 SE2d 150) (2021) (circumstantial guarantees of trustworthiness existed under Rule 807 based on a "long and close friendship," where the witness was the declarant's "lifelong" and "best" friend, and "[t]he pair talked to each other

erred in finding that the evidence failed to establish a close relationship between Aisha and Dixon.

Further, the State's argument that the trial court clearly erred in finding that Aisha and Dixon were "passing acquaintance[s]" is misguided. The court did not find that the women were "passing acquaintances" but rather that the State failed to prove that they had "a close relationship" and that "*Ms. Aisha Brown's recorded interviews did not indicate* that Ms. Dixon was anything more than a passing acquaintance." (Emphasis supplied.) Aisha's recorded interviews and the record as a whole support the court's findings.

---

daily and shared the personal details of their lives with each other"); *Rawls*, 310 Ga. at 214-215 (3) (a) (i) (concluding that the declarant's "close relationship with each of the[ ] witnesses gave [the declarant's] statements . . . sufficient guarantees of trustworthiness to be admissible under Rule 807," where the witnesses were the declarant's "best friend[ ]," cousin, and sister, and the declarant and witnesses "often confided" in each other); *Reyes*, 309 Ga. at 668 (2) (b) (statements were adequately trustworthy under Rule 807 where the declarant and witness "had a close relationship in which they regularly shared with each other what was happening in their lives"); *Miller v. State*, 303 Ga. 1, 5 (2) (810 SE2d 123) (2018) ("statement made to a close personal friend" was sufficiently trustworthy under Rule 807 where the witness and declarant "had known [each other] for three decades" and "maintained a close relationship"); *Smart v. State*, 299 Ga. 414, 422 (3) (788 SE2d 442) (2016) ("We cannot say that statements from a wife to her friends or family, or her own writings, which describe acts of domestic violence, do not, in fact, bear an increased level of trustworthiness [for purposes of Rule 807].").

The State also argues that the trial court clearly erred in finding that Dixon's intoxication weighed in favor of finding her statements insufficiently trustworthy. Citing *United States v. Two Shields*, 435 FSupp.2d 973 (D. N.D. 2006), where a federal district court found that statements made by a declarant with a blood-alcohol level "nearly five (5) times the legal limit" did not have sufficient guarantees of trustworthiness, id. at 979 (II) (C), the State argues that "mere intoxication is not determinative" of admissibility and that "a declarant's intoxication alone" does not support denying admission of hearsay evidence under Rule 807. This argument, however, misconstrues the trial court's analysis. The trial court considered Dixon's intoxication as a relevant factor, not a dispositive factor, in analyzing whether her statements were sufficiently trustworthy. The record supported the court's finding that Dixon was intoxicated when she made the statements at issue, and the court did not abuse its discretion in weighing that fact in its Rule

807 analysis. See *Two Shields*, 497 F3d at 794-795.[16]

In addition, the State challenges the trial court's decision to weigh Dixon's inability to identify Kenney in a photo lineup when assessing the trustworthiness of her statements under Rule 807. The State contends that this fact was "not probative of Dixon's capacity to discuss with Aisha Brown the cause of the yelling and shots both women overheard." But the trial court was authorized to conclude that Dixon's inability to remember what Kenney looked like, despite having spent hours with him on the night of Laquitta's death, showed that, when she spoke to Aisha shortly before and after the homicide, she had an impaired ability to accurately perceive, comprehend, and speak about the events surrounding the homicide. Accordingly, the trial court did not clearly err in finding that Dixon's

---

[16] We are unpersuaded by the State's argument that the court clearly erred "in commenting [on] Aisha Brown's supposed impairment at the time Sh[a]rrie Dixon made her statement." See *Rawls*, 310 Ga. at 214 (3) (a) (noting that statements are "considered sufficiently trustworthy" under Rule 807 "not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made" (citation and punctuation omitted)). Here, there is no indication in the trial court's order that Aisha's credibility factored into the court's Rule 807 analysis, as the court quoted the relevant language from our decision in *Rawls* and focused its intoxication analysis on Dixon's inebriation, rather than Aisha's.

inability to identify Kenney in a photo lineup weighed in favor of finding that her statements describing the circumstances surrounding Laquitta's shooting were insufficiently trustworthy under Rule 807.

Finally, the State contends that a "number of other circumstantial guarantees of trustworthiness," such as the lack of a "discern[i]ble reason [for] Dixon [to] lie to [Aisha]," support admission of Dixon's statements under the residual exception. But we cannot say that the trial court clearly erred in weighing more heavily other factors — such as the lack of a close relationship between Aisha and Dixon and Dixon's intoxication when she made the statements — in concluding that exceptional guarantees of trustworthiness were lacking, and therefore that Dixon's statements were inadmissible under Rule 807. See *Holmes*, 304 Ga. at 529 (2) (a) (noting that we will not overturn a trial court's residual-hearsay ruling "absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors" (citation and punctuation

31

omitted)).  Accordingly, we affirm.

*Judgment affirmed.  All the Justices concur, except Warren, J., who concurs specially, and LaGrua, J., disqualified.*

WARREN, Justice, concurring specially.

I concur in the judgment in this case, because I agree that the trial court did not abuse its discretion in excluding the evidence at issue under OCGA § 24-8-807.  And I agree with the majority insofar as it concludes that the State's arguments on appeal—that certain out-of-court statements should have been admitted under Rule 803 or Rule 807—fail.  But because I arrive at that conclusion by applying a different legal analysis, I concur specially.

As an initial matter, I am skeptical of a major premise of Division 2 in the majority opinion: that the State "affirmatively waived" arguments under Rule 803 that certain out-of-court statements were admissible as present-sense impressions or excited utterances.  I view the record differently: rather than affirmatively waiving arguments under Rule 803, the State simply failed to raise

32

a free-standing argument that the evidence at issue was admissible under Rule 803. Any mention the State made about Rule 803, including its statement, "[w]e can't use . . . [Rule] 803 by itself," was part and parcel of an argument that the evidence was instead admissible under Rule 807. In other words, the State's arguments about Rule 803 were made only in service of its Rule 807 argument, to show that the evidence at issue had "equivalent circumstantial guarantees of trustworthiness" as hearsay admitted under Rule 803 and to show that the evidence was not admissible under other hearsay exceptions. See OCGA § 24-8-807 ("A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule[.]"). What makes the State's argument difficult to decipher is that it appears to have misunderstood the requirements of Rule 803, apparently believing that a declarant's availability was a prerequisite for admission of her out-of-court statements, even though Rule 803 identifies hearsay exceptions that apply "regardless of whether the declarant is available as a witness." *Grier*

33

*v. State*, 313 Ga. 236, 244 (869 SE2d 423) (2022) (excited-utterance exception). Because the State did not make a free-standing Rule 803 argument before the trial court, it did not preserve that issue for ordinary appellate review.

With respect to the State's contention that the trial court was required to determine the admissibility of the evidence at issue under Rule 803 before deciding to deny its admission under Rule 807, I agree with the majority opinion's conclusion that the trial court was not *required* to do so. However, I note that the parties may have been able to avoid this appeal altogether if the trial court had followed this Court's admonition in *Hamilton*: "We caution that because the residual exception applies . . . only to statements not specifically covered by any law, trial courts should consider whether a specific exception to the hearsay rule applies before applying Rule 807." *State v. Hamilton,* 308 Ga. 116, 124 n.10 (839 SE2d 560) (2020) (citation, punctuation and emphasis omitted). To be sure, the text of Rule 807 does not require trial courts to determine whether other hearsay exceptions apply before denying a party's request to

admit evidence under the rule. But *Hamilton* indicates that trial courts should nonetheless consider doing so.[17] This case illustrates why that approach is a best practice: had the trial court considered whether the out-of-court statements at issue in this case constituted present-sense impressions or excited utterances under Rule 803, it likely would have concluded that the State was incorrect when it said that it "could not use" Rule 803 to admit at least some of those statements. See OCGA § 24-8-803 (1) & (2) ("The following shall not be excluded by the hearsay rule, even though the declarant is available as a witness: (1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter; (2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition[.]"). And this conclusion

---

[17] By contrast, the text of Rule 807 does require trial courts to determine whether hearsay exceptions apply before *admitting* evidence under that rule. See OCGA § 24-8-807 (applying to "statement[s] not specifically covered by any law").

could have presented a more straightforward basis for the trial court to deny the State's motion to admit the evidence under Rule 807 in this case. For this reason, I write to highlight once again the prudence of trial courts evaluating as a threshold matter in any Rule 807 analysis whether other hearsay exceptions could apply to the evidence at issue.

Decided January 18, 2023.

Admission of evidence. Fulton Superior Court. Before Judge Eaton.

*Fani T. Willis, District Attorney, Michael S. Carlson, Lyndsey H. Rudder, Kevin C. Armstrong, Karen S. Bemis, Jayna Easton, Bruce R. Hiles, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.

*Drake & Estes, R. Scott Estes*, for appellee.