**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: November 4, 2025

S25A1251. ASMELASH v. THE STATE.

PETERSON, Chief Justice.

Abel Asmelash appeals his convictions for malice murder and other offenses arising from the fatal shooting of Travis Ridley.[1]

---

[1] Ridley was shot on June 1, 2017. On November 27, 2018, a DeKalb County grand jury returned an indictment against Asmelash, Edward Tavarez, and Jeanmarie Gonzalez. The indictment charged Asmelash with malice murder, four counts of felony murder, criminal solicitation, two counts of armed robbery (naming Ridley as the victim in one count and Erica Shavers as the victim in the other), aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. The indictment charged Tavarez with many of those crimes, including malice murder, and it charged Gonzalez with making a false statement. Gonzalez's case was severed prior to a trial of Asmelash and Tavarez that took place in January 2019. See *Tavarez v. State*, 319 Ga. 480, 481 n.1 (2024). Asmelash's case was severed from Tavarez's during the January 2019 trial, due to a problem with redaction of Tavarez's statement pursuant to *Bruton v. United States*, 391 US 123 (1968). See *Tavarez*, 319 Ga. at 481 n.1, 483 n.4. At the close of that trial, Tavarez was found guilty of all charges against him and received a sentence of life in prison without the possibility of parole for malice murder; we affirmed his convictions and sentence last year. See id. at 481 n.1, 489. At a separate trial in May 2019, a jury found Asmelash guilty of all charges against him. On May 17, 2019, the trial court sentenced Asmelash to life in prison without the possibility of parole for malice murder, two life

Asmelash argues that (1) the trial court abused its discretion in denying the jury's request during deliberations to review surveillance video that had been admitted at trial, and (2) trial counsel rendered ineffective assistance by failing to call an alibi witness to testify. We conclude that neither any abuse of discretion in denying the jury's request for the video nor any deficient performance by counsel in failing to call the alibi witness prejudiced the defense, even when considered collectively. We affirm.

The evidence admitted at trial showed that on June 1, 2017, Ridley was fatally shot in a breezeway of the Avana Uptown

sentences for the armed robbery counts, three years in prison for criminal solicitation, and five years in prison for each of the firearms counts. The final disposition form provided that "all counts" were to run "consecutive" but also stated each of the non-murder convictions were to run "consecutive with Count 1." The remaining counts merged or were vacated by operation of law. Trial counsel filed a motion for new trial on September 18, 2019. On March 14, 2023, Asmelash obtained a writ of habeas corpus granting him 30 days to file a motion for new trial or notice of appeal, based on counsel's ineffectiveness in failing to timely file a motion for new trial. Based on this grant of relief, Asmelash filed a new motion for new trial on March 17, 2023; the motion was amended in August 2024. In an order entered on April 10, 2025, after hearings on three different days, the trial court denied the motion. Asmelash filed a timely notice of appeal. The case was docketed to this Court's August 2025 term of court and orally argued on October 21, 2025.

Apartments in DeKalb County.[2] The State's theory was that Ridley had planned to buy a large amount of marijuana from Asmelash and Edward Tavarez, while Asmelash and Tavarez planned to rob Ridley. The State's primary witness was Erica Shavers, Ridley's on-and-off-again girlfriend, who testified that Tavarez shot Ridley while Asmelash grabbed a bag of money from her. The State also relied on video-surveillance and cell-phone evidence to corroborate Shavers's account. Asmelash's defense at trial was that he was not at the scene of the shooting or otherwise a party to the crime.

Shavers gave the following account at trial. On the day of the shooting, Shavers and Ridley drove in Ridley's purple Challenger to a building where Ridley had some sort of store. Shavers understood that Ridley was carrying $36,000 in cash and planned to purchase something. Asmelash, wearing a white t-shirt, and another man, wearing an Armani Exchange shirt and a hat that said "DOPE,"

---

[2] Because this case involves questions of harmless error and prejudice under *Strickland v. Washington*, 466 US 668 (1984), the trial evidence is described in some detail rather than only in the light most favorable to the jury's verdicts. See *Wood v. State*, 316 Ga. 811, 812 n.2 (2023).

appeared at the store in a silver Mercedes.[3]  (Investigators later identified the man in the Armani Exchange shirt as Rafael Nin-Polanco.)  Asmelash went in and out of the store while Ridley talked to the man in the Armani Exchange shirt. The man in the Armani Exchange shirt suggested that Ridley follow them to "Clairmont" to handle their planned transaction. They all left the store, with Ridley and Shavers in the purple Challenger following the other two men in the silver Mercedes to a nearby Chevron gas station; the man in the Armani Exchange shirt was driving, and Asmelash was in the passenger seat. At the gas station, a friend delivered a gun to Ridley at his request. Ridley and Shavers then followed the silver Mercedes some distance away, using the expressway, to the parking deck of the apartment complex located off Clairmont Road that was later identified as the Avana Uptown Apartments. Shavers observed Asmelash in the passenger seat of the silver Mercedes as they drove away from the gas station, Shavers did not lose sight of the silver

[3] Shavers picked a photo of Asmelash out of a photo lineup on June 15, 2017.

Mercedes on the way to the complex, and Asmelash did not get out of the car on the way to the complex. While Ridley and Shavers waited in the car, Asmelash left the parking deck via an apartment-complex breezeway, and the man in the Armani Exchange shirt drove away to let another person into the parking deck. After a few minutes, a different Mercedes (a white one) driven by Tavarez entered the deck and parked. Asmelash returned from the breezeway, entered the white Mercedes, and sat with Tavarez for a moment. Ridley, Shavers, Asmelash, and Tavarez then got out of their cars and all walked into the breezeway, with Shavers carrying Ridley's bag of money. Once in front of a particular apartment that Tavarez claimed was his, Tavarez pulled out a gun and demanded the bag of money and the contents of Ridley's pockets. Asmelash took the bag of money out of Shavers's hand. Tavarez shot Ridley. Asmelash and Tavarez both ran back toward the parking deck, leaving Shavers banging on doors and looking for help.

The first 911 call was received at about 5:44 p.m. The medical examiner later determined that Ridley died of multiple gunshot

wounds.

In addition to statements by Shavers, police were able to tie Tavarez to the shooting in part based on social media and surveillance video showing that the white Mercedes seen leaving the apartment complex belonged to Jeanmarie Gonzalez and had been recently stopped by police in a traffic stop with Tavarez as the driver. Police determined that Asmelash was associated with the same home address as Tavarez and Gonzalez, on Brandy Oaks Lane in Stone Mountain in DeKalb County.

The jury saw surveillance videos or screen shots from videos from Ridley's store, the apartment complex, and two different gas stations. The surveillance video from the store showed Asmelash, wearing a white t-shirt, arriving in a silver Mercedes at 4:12 p.m., going in and out of the store multiple times, and leaving as a passenger in the silver Mercedes at 4:50 p.m., with the purple Challenger following. The jury saw video surveillance from the Chevron station, and the State admitted screen shots from that video. According to a detective's testimony and the screenshots, the

6

video showed the silver Mercedes arriving at the Chevron at 4:52 p.m. and leaving the Chevron, followed by the purple Challenger, at 4:59 p.m.[4]

Surveillance video from the Avana Uptown Apartments showing two angles, from the complex gate and the entrance to the parking deck, also was admitted into evidence, and some portions were played for the jury. A series of screenshots from the Avana videos also was admitted and shown to the jury. As narrated by a detective in his testimony, the Avana complex video surveillance shows that at 5:21 p.m., the silver Mercedes, driven by Nin-Polanco, and the purple Challenger arrived at the complex gate. The detective testified that a front-seat passenger could be seen in the silver Mercedes as it entered the parking deck; although that is not at all clear to us from our review of the video and the admitted screenshots, defense counsel stated in oral argument to this Court that a passenger can be seen in the car. The complex video

---

[4] The copy of the Chevron surveillance video in our record is of such poor quality as to be of no real evidentiary value.

surveillance shows that at 5:28 p.m., the silver Mercedes exited the complex gate; the detective testified that no one could be seen in the front passenger seat, but, again, this is not entirely clear from the video or the admitted screenshots. The silver Mercedes appeared in surveillance video of a nearby BP gas station at 5:29 p.m.; although the video was admitted, the jury was shown only screen shots of that video. The screen shots from the BP surveillance video are blurry and do not have time stamps on them, but the detective testified based on the screen shots and his report that a white Mercedes pulled in and parked next to the silver Mercedes at the BP, the white Mercedes left the BP at 5:37 p.m., and the silver Mercedes left at 5:39 p.m.[5] The Avana complex video surveillance then shows the white Mercedes entering the gate at 5:38 p.m. and exiting at 5:43 p.m. The detective testified that when Tavarez's white Mercedes left the complex, Asmelash could not be seen in the car on the video evidence, explaining that the windows were tinted. Although the Attorney General in his brief to this Court represents that the video

---

[5] The detective testified that Asmelash is not seen in the BP video.

surveillance shows someone in the passenger seat when the white Mercedes exits, based on our review, it is nearly impossible to tell whether there is anyone there.

The State also relied on phone records and cell-site evidence. Phone records showed that Tavarez's and Asmelash's phones exchanged about 250 texts and phone calls from April 28, 2017, to June 27, 2017. On the day of the shooting, at 5:37 p.m. a phone associated with Nin-Polanco called Tavarez's phone and received a call from Ridley's phone. At 5:38 p.m., Nin-Polanco's phone called Asmelash's phone and remained connected for two minutes. Nin-Polanco's phone called Tavarez's phone at 5:40 p.m. and 5:45 p.m. Nin-Polanco's and Asmelash's phones had a three-minute call at 5:48 p.m., then Nin-Polanco's phone called Asmelash's phone again at 5:55 p.m.

The defense initially filed an alibi notice stating that at the time of the shooting, Asmelash was at Hanu Hookah Lounge, listing Seti Araya and Mahlet Magna as supporting witnesses. Just prior to the trial at which Asmelash was convicted, after the State

provided defense counsel the report of the State's cell-site expert, the defense filed a second alibi notice, also listing Araya and Magna as witnesses but alleging that Asmelash was at Desta Ethiopian Kitchen at the time of the shooting.  But the defense introduced the testimony of only two witnesses at trial: the defense's own cell-site data expert[6] and Asmelash himself. The two alibi notices, as well as the notice of disclosure of the State's cell-site expert report, were introduced by the State and admitted as exhibits at trial.

In his trial testimony, Asmelash acknowledged that he was with the group at the store and the Chevron station, saying he received a ride from Nin-Polanco to the "Clairmont area" where the shooting occurred. But he insisted that he was not at the apartment complex when the shooting occurred and was not involved in the robbery or shooting. Asmelash testified that he was in a car headed

---

[6] The defense expert testified that he could not pinpoint the exact location of Asmelash's phone from 5:22 to 5:45 p.m. on the day of the shooting, because it was using two adjacent sectors, with the majority of Asmelash's calls during that time being in Sector 2, but "chances are" the phone was somewhere in the middle between the two sectors. The defense expert said he did not know anything about the locations of Desta or the hookah lounge.

to the Avana complex, but was dropped off at the nearby Desta Ethiopian Kitchen restaurant, with Ridley also pulling into the restaurant parking lot. Asmelash testified that he and his friend Zetseat ordered food at Desta, left to go to Hanu Hookah Lounge to pay a tab from the night before, then returned to Desta to pick up their food before heading to Asmelash's mother's house in Snellville at around 6:00 p.m. Asmelash claimed that between stops, he attempted to call Nin-Polanco multiple times because he believed that he had left his keys in Nin-Polanco's car. Asmelash claimed that Nin-Polanco came to Snellville to give Asmelash his keys back. Thereafter, Asmelash claimed, he and Zetseat went to a bar, arriving between 8:00 and 9:00 p.m. and staying for a couple of hours before picking someone up at the airport. Asmelash testified that he recalled going to Desta only after seeing the State's cell-site analysis. On cross-examination, the prosecutor questioned Asmelash about his changing alibi notices and his alibi witnesses' failure to testify; Asmelash responded that his alibi witnesses were not permitted to testify because they had been watching the trial

11

and that he was "here testifying for myself." Regarding his relationship with Tavarez, Asmelash said that they had merely a "business relationship" and texted about "landlord/tenant issues," but acknowledged that Tavarez had texted him asking for marijuana. The State on cross-examination of Asmelash also admitted evidence of his various prior criminal convictions, including for burglary. Apparently pointing to the Avana complex surveillance footage or a screen shot thereof, the prosecutor asked Asmelash "who is the passenger" in Nin-Polanco's car when it entered the apartment gate; Asmelash replied that he had "no idea" and "couldn't say for sure" if the passenger was wearing a white shirt.

Cell-site evidence showed that Asmelash's phone was near the convenience store and the Chevron gas station at 4:29 p.m. on the day of the shooting, then traveled in a pattern similar to Ridley's phone, hitting towers south of the Avana complex at 5:10, 5:13, and 5:18 p.m. A map in the State's expert's report showed that the Avana complex was several miles northeast of the Chevron gas station. The

State's expert testified that Asmelash's phone alternated between two adjacent sectors (Sectors 2 and 3) from 5:22 to 5:45 p.m., concluding that Asmelash's phone typically would be found in the overlap between the two sectors, where the Avana complex was located.[7] Desta Ethiopian Kitchen is in Sector 2. The phones of Asmelash, Gonzalez, and Tavarez converged near the Brandy Oaks Lane home in Stone Mountain on the night of the shooting. In particular, Asmelash's phone was in the Stone Mountain area at 6:28 p.m., the Rockbridge area at 6:43 p.m., then at the Brandy Oaks Lane home in Stone Mountain at about 8:35 p.m.

1.    Asmelash argued that the trial court abused its discretion in rejecting the jury's request to view the Avana surveillance video that was admitted at trial. We conclude that any abuse of discretion in the trial court's response was harmless.

At the time the Avana surveillance video was introduced into

---

[7] The State asked its expert which sector tower a phone would ping off if it were at the Hanu Hookah Lounge, but the expert's testimony about that is not entirely clear from the transcript, because it states that the expert non-verbally indicated a particular tower on a map.

13

evidence at trial, the prosecutor said it was a "very lengthy video" so he intended to introduce some screen shots. The trial court asked how long the video was. When the prosecutor responded that it was four hours long, the trial court responded, "All right. That's fine. I was just letting the jury know in perspective. They — they may have an opportunity to see it if — if they wish. … I was just giving them a time frame." The prosecutor then reiterated that he was not going to play the video but was "just going to show the screen shots." Shortly thereafter, the transcript indicates that "the video plays in open court," although it is not clear what portions of the Avana videos were shown to the jury. It appears from the transcript that in closing argument the prosecutor pointed to video footage (or a screenshot thereof) of the silver Mercedes entering the Avana complex or parking deck, and, referencing Shavers's testimony, argued that Asmelash was in the car, stating that a white shirt could be seen on the image "plain as day" and "that is him in that car[.]"

During deliberations, the jury sent a note: "We would like to see the Avana surveillance video — can we get AV equipment to play

14

this video?" When the trial court asked the parties' positions on the request, the prosecutor replied, "Leave it to the Court's discretion," and defense counsel said, "We're fine with the jury's request." The trial court construed the note narrowly as a request for AV equipment in the jury room, however, saying, "I can't give them AV equipment," and suggesting that he would not bring the jurors into the courtroom to play the video because they had not asked for that. Defense counsel suggested that the court "instruct the jury that they can see the video, however, they cannot see the video with AV equipment in the jury room and that they can come into the courtroom … to watch the video." The trial court indicated that it would simply respond, "no" to the jury's question; defense counsel argued that "would mislead the jury," and the trial court responded, "All right. I'm glad you have that opinion." The trial court responded to the jury's question with one word: "No." After dismissing the jury to the jury room to resume deliberations, the trial court again asked the parties their positions, and defense counsel replied: "Just pursuant to our — our conference prior to you bringing them out,

15

the Court's technique is what it is. All right."

"Whether to grant a jury's request to review video evidence is squarely within the trial court's discretion." *Johnson v. State*, 301 Ga. 205, 208 (2017). Moreover, we will not reverse a conviction based on nonconstitutional trial court error where it is highly probable that the error did not contribute to the verdict. See *Tarver v. State*, 319 Ga. 165, 169–70 (2024). Assuming without deciding that the trial court abused its discretion in denying the jury's request and that Asmelash in fact preserved such an argument,[8] we conclude that it is highly probable that any such abuse of discretion did not contribute to the verdict. As the trial court found in denying the motion for new trial, "the jury had already seen the relevant portions of the video when it was admitted into evidence and the still frame images from the video, which were admitted as separate exhibits"

---

[8] Notwithstanding counsel's arguments to the trial court prior to its response to the jury's note, the trial court concluded in denying Asmelash's motion for new trial (in the alternative to a ruling on the merits) that Asmelash failed to preserve this claim for review by making a contemporaneous objection. The District Attorney argues waiver on appeal; the Attorney General does not.

and "available to the jury for their review during deliberations." Thus, the video requested by the jury was at least to some extent cumulative of evidence to which the jury had access. Although Asmelash suggests that the video was exculpatory, we disagree. At best for the defense, the video was neither inculpatory nor exculpatory, in that it did not clearly show one way or the other whether the silver Mercedes had a passenger when it entered the Avana parking deck or whether the white Mercedes had a passenger when it exited, although Asmelash appears to acknowledge (on cross examination, and through counsel at oral argument) that the video shows *a* passenger in the silver Mercedes when it entered. Although Asmelash suggests that reviewing the video footage might have confirmed for the jury that the State was incorrect in arguing in closing that Asmelash could be seen in the silver Mercedes when it arrived at the Avana complex, it is highly probable that another review of the video would not have resolved any uncertainty in the jury's mind in this regard, given that based on our review of the video it is not at all clear that there was someone in the front

17

passenger seat.

Moreover, the State's case was fairly strong, as it was supported by an eyewitness to the shooting, Shavers, who had multiple opportunities to view the man who took the money and no obvious motivation to lie about his identity. To be sure, Shavers had her credibility challenged in several ways — including regarding her lack of knowledge of Ridley's job or sources of income, her admitted marijuana use before the shooting, and the extent to which her initial description of the man who took the money matched Asmelash. And Asmelash argues on appeal that Shavers "could have been prosecuted for felony murder given her participation in the underlying drug offense" but "was given a 'pass' by the prosecution[.]" But he offers no legal or factual support for that assertion. Indeed, Shavers testified that the prosecution had not even discussed with her the possibility of charging her with a crime. Notwithstanding challenges to Shavers's credibility, her testimony was corroborated by phone records and cell-site evidence. And Asmelash's defense was problematic at best, given that he provided

a new alibi notice referencing a different location after the State disclosed its cell-site analysis and given the discrepancies between the cell-site evidence and Asmelash's testimony about his whereabouts after the shooting. See *Sinkfield v. State*, 318 Ga. 531, 539 (2024) ("jurors are authorized to consider their disbelief in Appellant's testimony as substantive evidence of his guilt" (cleaned up)). For these reasons, it is highly probable that the trial court's refusal to allow the jury to view the Avana surveillance video did not contribute to the verdict. See *Tarver*, 319 Ga. at 172–73 (any error in exclusion of evidence was harmless where excluded evidence was largely cumulative of other evidence introduced at trial and the evidence supporting the defendant's defense was weak).

2. Asmelash also argues that he was denied the effective assistance of counsel by trial counsel's failure to request permission to present the testimony of an alibi witness who had sat through testimony during the trial. We conclude that any deficient performance in this regard did not prejudice the defense.

In support of his amended motion for new trial, Asmelash

raised a claim that counsel was ineffective for failing to request permission to present the testimony of an alibi witness who purportedly had violated the rule of sequestration. In hearings on the motion for new trial, the defense introduced the testimony of Araya, who was Asmelash's friend and one of the witnesses referenced in the alibi notices. Araya testified as follows: She saw Asmelash at Desta at around 5:00 p.m. on the day of the shooting and joined him and another woman at a table where they were eating while Araya waited for her take-out order. During this time, Araya did not see Asmelash receive any phone calls or send or receive any text messages. She told Asmelash's trial attorneys prior to trial of her willingness to testify to seeing Asmelash at Desta. When she met with Asmelash's lawyer, she was able to determine what day and time she had seen Asmelash at Desta based on her work schedule and estimated drive time to the restaurant. Araya acknowledged that she had not provided trial counsel any documentation (such as cell phone records or sales receipts) to support her testimony, nor had counsel asked her to do so. She

recalled observing the last three days of trial, and was surprised and upset when trial counsel told her they would not be using her as a witness.

Trial counsel testified that the defense team had indeed talked to Araya before trial and that she provided information that supported the alibi. Both of Asmelash's trial lawyers attributed their failure to call Araya to their belief that she would not been permitted to testify given her presence in the courtroom during trial. The courtroom was crowded, the lawyers explained, and they were not aware of Araya's presence until multiple days of trial had passed.

The trial court denied the motion for new trial. The trial court pretermitted whether counsel had been deficient in failing to sequester Araya and present her testimony at trial and concluded that Asmelash had not proven prejudice, based on its finding that Araya's testimony would not have been compelling enough to overcome the strength of the evidence against Asmelash.

To prove his claim of ineffective assistance of counsel, Asmelash must show that counsel's performance was deficient and

21

that counsel's deficient performance prejudiced Asmelash's defense. See *Strickland v. Washington*, 466 US 668, 687 (1984). "If a defendant fails to establish one of these two prongs, we need not examine the other." *Troutman v. State*, 320 Ga. 489, 494 (2024) (cleaned up). "To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." Id. (quotation marks omitted). "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. (cleaned up). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." Id. (quotation marks omitted).

Asmelash has not met his burden to show prejudice, because there was not a reasonable probability that he would have been acquitted had Araya testified. As noted above, the State presented

the testimony of an eyewitness who clearly identified Asmelash as the man who took the money. Shavers's testimony was corroborated by phone records and cell-site evidence. Araya's testimony would not have provided a compelling alternative. In particular, Araya's proffered testimony would have contradicted that of Asmelash, in that she proffered that she saw Asmelash dining in at Desta Ethiopian Kitchen, while he testified that he got his food to go. Araya's proffered testimony also is at odds with the cell-site and video evidence. Araya testified that she saw Asmelash at Desta at around 5:00 p.m., while a screenshot of surveillance video, as explained by a detective's testimony, showed that Nin-Polanco's car, in which Asmelash admitted that he was a passenger, did not even leave the Chevron gas station, which was several miles from the area where Desta and Avana were, until 4:59 p.m. In addition, the cell-site evidence showed that Asmelash's cell phone was south of the area of Desta and Avana until at least 5:18 p.m. Thus, Araya's testimony actually may have been detrimental to the defense, such that Asmelash cannot show prejudice from counsel's failure to call

23

her to testify. See *Navarette v. State*, 283 Ga. 156, 162 (2008) (appellant could not show prejudice from any deficient performance in failure to call witness, where witness's proffered testimony differed from appellant's trial testimony in several material respects, such that the witness's testimony "actually may have been detrimental to the defense"), superseded by statute on other grounds as stated in *State v. Kenney*, 315 Ga. 408, 417 (2023).

Moreover, Araya's testimony would have been problematic given that the defense listed her as an alibi witness on the original alibi notice stating that Asmelash was at Hanu Hookah Lounge, before Asmelash claims that he recalled that he was at Desta after he saw the cell-site evidence, suggesting that her testimony also may have been crafted to match the State's evidence. Given Araya's friendship with Asmelash and the bias the jury would have been permitted to infer therefrom, Asmelash cannot show a reasonable probability that the jury that apparently did not believe Asmelash would have viewed his testimony differently had they heard Araya backing up his story, especially given the discrepancies, noted above,

between the cell-site evidence and his testimony about his whereabouts after the shooting.

We conclude that Asmelash has not shown a reasonable probability of a different result in the absence of the alleged deficient performance of counsel. See *Navarette*, 283 Ga. at 162.

3. Finally, Asmelash argues that his convictions should be reversed due to the cumulative prejudice of the trial court's error in denying the jury's request and counsel's ineffectiveness in failing to call the alibi witness. See *Lane v. State*, 308 Ga. 10, 17 (2020). We disagree. At most there was one trial court error and one deficiency on the part of trial counsel, but each was harmless. Given our conclusions above and even assuming that these sorts of errors should be considered cumulatively, we conclude that Asmelash has failed to establish that the combined prejudicial effect of the assumed trial court error and assumed deficient performance of trial counsel denied him a fundamentally fair trial. See *Huff v. State*, 315 Ga. 558, 568–69 (2023). "We have yet to decide how multiple standards for assessing prejudice may interact under cumulative

error review of different types of errors, but we need not do so here, because [Asmelash's] claims of cumulative prejudice fail even under the higher standard implicated by these errors." *Park v. State*, 314 Ga. 733, 745 (2022). The State's case was strong as outlined above; the State presented the testimony of an eyewitness who clearly identified Asmelash as the man who took the money, and Asmelash's testimony itself contradicted the cell-site evidence, such that the jury may have considered his testimony as evidence of his guilt if the jury found it not credible. See *Sinkfield*, 318 Ga. at 539. The video footage at issue was cumulative of the screenshots available to the jury and was not exculpatory. And Araya's proffered testimony was at odds with the cell-site evidence and other video evidence, as well as Asmelash's testimony.

*Judgment affirmed. All the Justices concur.*