320 Ga. 489
FINAL COPY

S24A1163. TROUTMAN v. THE STATE.

PETERSON, Presiding Justice.

Andrew Troutman appeals his malice murder conviction for the stabbing death of Earl Clemons.[1] Troutman argues that (1) the evidence was insufficient to support his conviction under both federal due process and OCGA § 24-14-6; (2) the State committed prosecutorial misconduct; and (3) trial counsel rendered ineffective assistance. We conclude that the evidence was constitutionally

---

[1] The stabbing occurred in January 2014. A DeKalb County grand jury indicted Troutman on April 16, 2014, charging him with malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and aggravated assault (Count 3). In a pre-trial appeal, the State challenged the trial court's order suppressing a statement that Troutman made to police. This Court affirmed in part and reversed in part, holding that the statement in question was taken in violation of *Miranda* but was not involuntary as a matter of due process. See *State v. Troutman*, 300 Ga. 616 (797 SE2d 72) (2017). On remand, at an August 2019 trial, the jury found Troutman guilty of all counts. The trial court sentenced Troutman to life with the possibility of parole for Count 1, vacated Count 2, and merged Count 3 with Count 1. Troutman timely moved for a new trial on September 10, 2019, and amended that motion through appellate counsel on February 12, 2024. After a hearing on March 8, 2024, the trial court denied that motion in an order entered on March 27, 2024. Troutman filed a timely notice of appeal, and the case was docketed to this Court's August 2024 term and submitted for a decision on the briefs.

sufficient, and OCGA § 24-14-6 does not apply. Some of the claims of prosecutorial misconduct were not preserved for our review, and the others were resolved in Troutman's favor below. With respect to Troutman's various claims of ineffective assistance, we conclude that Troutman has not proven prejudice from either of two identified or assumed deficiencies, even when considered collectively. We affirm.

The evidence at trial showed the following. Troutman, a 21-year-old high school student, and Clemons, a student at DeVry University, were friends. But their friendship deteriorated when Clemons and a mutual friend whom Troutman had dated, Marlana Ackey, created a fake Facebook profile featuring naked photos of Troutman. Troutman thereafter threatened Clemons and Ackey, stating that he was going to cut Clemons's throat.

On January 22, 2014, Troutman appeared at DeVry looking for Clemons, apparently upset about something. On January 24, Troutman used someone else's phone to call Clemons and convinced him to meet up at a vacant DeVry campus building located in

2

DeKalb County.

A security guard patrolling the area of the vacant building on the morning of January 25 discovered Clemons's dead body lying on the ground outside. Clemons had been stabbed several times in the neck and abdomen; the medical examiner testified that these wounds were the cause of death. Clemons's penis also had been slashed several times; the medical examiner opined that these were likely post-mortem injuries.

Troutman gave extensive statements to the police. In the portion of the statements played for the jury, Troutman said that he had planned to meet up with Clemons to discuss their estrangement but changed his mind. Troutman asked police if turning off a cell phone would prevent the police from tracking the owner's location. The jury heard Troutman tell police he was "kind of happy and glad he's dead[.]"[2]

---

[2] Troutman eventually admitted to police that he killed Clemons — although he tried to suggest that Clemons was stabbed accidentally while the two were tussling — but the trial court suppressed that portion of the interview on *Miranda* grounds, a ruling affirmed by this Court on an interlocutory appeal

3

A cell phone associated with Troutman did not make or receive any phone calls or send or receive any texts on January 22, 23, or 24, 2014, and the phone's location during that time could not be determined. Troutman's MARTA card records and surveillance photos show that on January 24 Troutman arrived at the Avondale MARTA station at 4:21 p.m. and exited from the Decatur MARTA station at 4:32 p.m.[3] A detective testified that Troutman told him he caught a bus from his high school to the Decatur area that day, which contradicted MARTA records.[4] The Avondale station is the MARTA station closest to the vacant DeVry building, about a mile away. Troutman did not use his MARTA card again until boarding a bus at 5:57 p.m. later that day. The State also presented evidence that a fake DeVry student identification card with Troutman's

by the State. See *Troutman*, 300 Ga. at 617-618 (1). That evidence was not admitted at trial, and so we do not consider it in evaluating the sufficiency of the evidence or any of the other issues raised in this appeal.

[3] As part of the defense case, Troutman called a MARTA manager and elicited her testimony that passengers sometimes enter MARTA buses and rail stations without swiping their MARTA Breeze card, such that their ride is not reflected in MARTA transaction records.

[4] The portion of Troutman's statement to police admitted at trial was not entirely clear on that point.

picture but a different name was recovered from Troutman's bedroom.

According to testimony by Troutman's uncle, who lived with Troutman and his mother at the time of the murder, at some point on January 24, Troutman returned home and told his uncle that he had just killed someone and stolen a pack of cigarettes from him. The uncle testified that Troutman previously had discussed having "a beef with someone" because that person "told some lies on him."[5]

The jury also heard the testimony of Ackey, as well as recordings of unusual phone conversations between Ackey and Troutman. While Troutman was out on bond, Ackey reconnected with him in an unusual way, creating a Facebook page in which she

---

[5] In addition to eliciting this testimony, the State admitted an audio-recorded statement to police from March 2016 in which the uncle said that on the day of Clemons's murder, Troutman told him he and someone else had killed someone and taken the person's cigarettes. During cross-examination, the uncle acknowledged telling a detective in January 2014 that on January 24 Troutman had not said anything about getting into a physical altercation with anyone that day, that he did not see any blood on Troutman's clothes when he arrived home, and that Troutman did not "have a knife or cutting instrument on him" that day. A written statement from this interview, admitted into evidence, indicated that the uncle said he could not be sure of when he got home that day "because of medication and drinking beer[.]"

held herself out as "Princess Franco" so that Troutman would communicate with her. Eventually the two communicated in phone conversations, recorded by Clemons's mother, in which Ackey pretended to be "Princess Franco"; the recordings were admitted into evidence and played for the jury. In the recorded conversations, Troutman said that he had stabbed Clemons (although Troutman denied mutilating Clemons's penis) and discarded the knife in an incinerator at his mother's job. Troutman said that Clemons at one point "tried to defend himself" and "tried to swing," but "it was too late." Troutman bragged that no DNA would be found on his own clothing. Troutman said that he "loathed" Clemons and "started laughing" when he saw a picture of Clemons's dead body.

At trial, Troutman did not testify and presented an alibi defense. Troutman also sought to undermine the credibility of his uncle and suggested that Troutman's statements to his former girlfriend were fabrications designed to impress her. The jury found him guilty of all charges.

1. Troutman first argues that the evidence was insufficient to

support his conviction. We disagree.

In arguing that the evidence was insufficient, Troutman cites *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), which articulates the standard for evaluating the sufficiency of the evidence as a matter of constitutional due process. Applying that standard, we view the evidence in the light most favorable to the verdict and inquire whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See id. at 319. "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019) (citation and punctuation omitted).

Examining the record here in the light of that standard, the evidence admitted at trial was sufficient to authorize the jury's verdict on the malice murder count. That evidence included, among other things, evidence that Troutman had threatened to cut the victim's throat and that he later confessed to the stabbing to at least

7

two different people — his uncle and his former girlfriend. In arguing that the evidence was insufficient, Troutman argues that those incriminating statements "were shown to be the ramblings of an unhealthy mind[.]" He also argues that because MARTA records (used by the State to suggest Troutman lied to police about his whereabouts) are not always accurate, any discrepancy between the records and his statements is not "persuasive." But, again, it was up to the jury to consider the weight of, and resolve any conflicts in, the evidence. Troutman also points to a lack of eyewitnesses and surveillance video, but "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Plez v. State*, 300 Ga. 505, 506 (1) (796 SE2d 704) (2017).

Troutman also cites OCGA § 24-14-6, which provides that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." But "if there is any direct evidence presented by the

State, the circumstantial evidence statute does not apply in a sufficiency analysis." *Brown v. State*, 314 Ga. 193, 196 (1) (875 SE2d 784) (2022). And here the State did present direct evidence of Troutman's guilt, in particular the testimony of his uncle about Troutman's confession to him, as well as the recording of Troutman's confession to Ackey. See id. at 197 (1) (testimony of a witness that the defendant had confessed to that witness is direct evidence of guilt). Therefore, OCGA § 24-14-6 does not apply here.

2. Troutman next argues that the State committed prosecutorial misconduct in several respects, particularly by vacillating over when the murder occurred and by making improper comments in closing argument. We conclude that these arguments either were not preserved for our review or were resolved in Troutman's favor below, presenting nothing for our review.

(a) Troutman is imprecise as to when he claims the State acted improperly regarding its theory of the timing of the crimes. On appeal, Troutman claims that the State acted improperly "[b]y indicting for a date range, claiming that the exact date was

unknown, when they were arguing at trial that the exact date and almost the exact time had been known to them all along, then switching back to the exact date unknown theory during the charge conference." But a claim of prosecutorial misconduct generally must be raised at trial in order to be preserved for appellate review. See *Davis v. State*, 316 Ga. 418, 424-425 (4) (b) (888 SE2d 546) (2023). Troutman never raised at trial any objection framed as one of "prosecutorial misconduct" as to any of these actions by the State. And to the extent that he raised any sort of objection at all to these actions at trial, he received a favorable outcome.

Regarding the indictment itself, each count of the indictment — which charged Troutman with malice murder, felony murder, and aggravated assault — included a date range, alleging that the crime was committed "between the 24th day of January, 2014, and the 25th day of January, 2014, the exact date of the offense being unknown to the Grand Jury[.]" "Generally, an indictment which fails to allege a specific date on which the crime was committed is not perfect in form and is subject to a timely special demurrer." *State v.*

10

*Layman*, 279 Ga. 340, 340-341 (613 SE2d 639) (2005) (citation and punctuation omitted). The failure to raise such an issue in a timely filed special demurrer prior to trial waives the issue for direct appeal. See *Miller v. State*, 305 Ga. 276, 280-281 (3) (824 SE2d 342) (2019). Although Troutman filed a general demurrer challenging the felony murder statute as unconstitutionally vague, he filed no special demurrer challenging the indictment for lack of precision in its allegations as to when the crimes were committed. So no claim of prosecutorial misconduct based on the allegations in the indictment about the timing of the crime is preserved for review.

In complaining that the State "argu[ed] at trial that the exact date and almost the exact time had been known to them all along," Troutman appears to be referencing a point in the trial when, outside of the presence of the jury, the State suggested that certain evidence that the defense planned to introduce fell outside of his notice of alibi. During the exchange between the parties and the court, the prosecutor appeared to suggest that the killing had occurred on the afternoon of January 24, 2014, adding that

11

"[f]rankly, it has never been the State's position that the murder occurred overnight." Defense counsel argued to the trial court that this represented a change of the State's theory but sought no remedy for this alleged change of position other than inclusion of the alibi evidence the State sought to exclude. The trial court ruled in Troutman's favor, allowing the defense to present the alibi evidence at issue.

Troutman did object to the State's request for a jury instruction that "when the exact date of a crime is not a material allegation of the indictment, the crime may be proved to have taken place on any date prior to the return of the indictment." At the charge conference, the State contended that the charge was relevant because both the medical examiner and the lead detective testified that they could not determine the exact time of death. The defense objected on the grounds that the State had "narrowed" the time of the offense to "either before 4:30" or "between 4:30 and 6:00 p.m." on January 24, 2014, and the defendant had put up an alibi defense. The trial court agreed at the charge conference to give the charge, but that language

12

was not included in the final charge to the jury. Thus, as any particular objection to the State's handling of the issue of the timing of the crimes was resolved in Troutman's favor, this claim of prosecutorial misconduct leaves us nothing to review.

(b) Troutman also argues that the State committed misconduct by stating in closing argument that (1) Troutman's mother, who testified for the defense, had lied both to the police and to the jury and had been charged with giving a false statement in connection with the case; and (2) the trial could have been shorter if the defense had not "called in all the witnesses who had absolutely nothing to do with this case" and "were just distractions." But Troutman did not object to either of these comments at trial. Aside from the general requirement that claims of prosecutorial misconduct be preserved, this Court clearly has stated that "we do not review unpreserved challenges to closing arguments in non-death penalty cases, even for plain error." *McIver v. State*, 314 Ga. 109, 152 (3) (g) (875 SE2d 810) (2022) (citation and punctuation omitted). Therefore, these claims of prosecutorial misconduct also leave us nothing to review.

13

3. Troutman also raises several claims of ineffective assistance of counsel. We conclude as to each claim either that Troutman has not shown that counsel performed in a constitutionally deficient manner, or that he has not shown that any deficient performance affected the outcome of the trial.

To prove his claim of ineffective assistance of counsel, Troutman must show that counsel's performance was deficient and that counsel's deficient performance prejudiced Troutman's defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "If [a defendant] fails to establish one of these two prongs, we need not examine the other." *Payne v. State*, 314 Ga. 322, 328 (3) (877 SE2d 202) (2022) (citation and punctuation omitted). "To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." Id. at 328-329 (3). "To establish prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional error,

the result of the proceeding would have been different." Id. at 329 (3) (citation and punctuation omitted). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." Id. (citation and punctuation omitted).

(a) Troutman argues that counsel's insistence that the jury hear a part of the recordings of Ackey's phone conversations with Troutman in which Troutman described involvement in a gang and a California murder constituted ineffective assistance in that it introduced bad-character and extrinsic evidence. We conclude that Troutman has not proven any deficient performance in this regard.

In the recorded phone conversations, Ackey encouraged Troutman to swap secrets with her as a romantic bonding exercise, claiming that she killed her best friend, then eliciting from Troutman details of his killing Clemons. In addition to Troutman's confession to killing Clemons, the recording of Ackey's conversation with Troutman included Troutman saying that he was associated with a gang, that he previously committed murder (including by use

15

of "guns, knives, [and] switchblades"), that he murdered a pregnant woman in California as part of gang activity, and that in the course of that murder he "slit her throat, cut her open and put the baby inside a f**king Happy Meal box inside the mailbox." Despite the disturbing and incriminating nature of these references, defense counsel objected to at least some of the State's proposed redactions of recordings of the conversations between Ackey and Troutman. Defense counsel in particular sought inclusion of Troutman's statements about the California killing, suggesting that it was relevant because it showed that both Ackey and Troutman were using "exaggerations" and "lies" during their conversation. The trial court ruled that the recordings should not be redacted to the extent that the parties could not agree on redactions. In her closing argument, defense counsel contended that because the California story was obviously not true — as neither Troutman nor his mother owned a car, Troutman did not have a driver's license, and he had never been to California — this showed that Troutman was merely making up stories to impress Ackey.

Given the unusual facts of this case, we cannot say that it was objectively unreasonable for counsel to seek admission of a more complete version of the recordings, on which both Ackey and Troutman made outlandish claims in an apparent attempt to cement a relational bond. "Deliberate choices of trial strategy and tactics are within the province of trial counsel after consultation with her client." *Smith v. State*, 300 Ga. 532, 536 (3) (a) (796 SE2d 671) (2017) (citation and punctuation omitted). Although Troutman's description of a murder in California was disturbing, the State essentially admitted in closing that it was a fabricated story. Given that Troutman has made no argument on appeal that the confession to killing Clemons heard on the recordings was itself inadmissible, it was reasonable for counsel to have concluded that the best way to counter the damaging nature of the statements about Clemons was to have the jury hear a more complete version of the recordings, in hopes that the jury would conclude that Troutman also had lied when he told Ackey that he killed Clemons in an attempt to impress or otherwise bond with her. See *Ford v. State*, 290 Ga. 45, 48 (5) (a)

17

(717 SE2d 464) (2011) (counsel did not perform deficiently in failing to object to testimony allegedly attacking defendant's character, where defense counsel testified at motion for new trial hearing that she did not object because it showed the witness's bias against the defendant). Troutman did not show deficient performance here.

(b) Troutman argues that trial counsel rendered ineffective assistance by presenting a "fatally flawed" alibi defense, in that the primary alibi witness presented by counsel, Troutman's mother Ramonia, could not supply an alibi for the date and time of the murder. We conclude that even if counsel's performance was deficient in this regard, Troutman has not shown prejudice.

Ramonia testified that Troutman did not meet her at a particular bus stop as usual when she arrived there on her way home from work in the early evening of January 24, 2014, which fell on a Friday. Defense counsel then asked Ramonia if she recalled telling police that Troutman met her at the bus stop as usual. "They got Friday confused with that Thursday[,]" she responded. Ramonia testified that on January 24 Troutman arrived home about 15

18

minutes after she did, around 6:15 p.m. She testified that he acted normally, although she could not say when he went to bed that night, saying, "He was in his room, I was in mine." Ramonia also testified that she had never worked at a place with an incinerator on site and that Troutman had never been outside of the state of Georgia. Ramonia's written statement to police, in which she appeared to say that Troutman met her as usual on the afternoon of January 24, was admitted by the State on cross-examination, during which the State sought to elicit Ramonia's admissions that she was "locked up for lying to police officers" in conjunction with the case. The defense presented additional evidence as well, including school records showing that Troutman was present in homeroom at his high school on the morning of January 24.

"Decisions about which witnesses to call at trial are matters of trial strategy and tactics, and such strategic and tactical decisions do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances." *Jackson v. State*, 318 Ga. 393, 410 (4)

19

(c) (897 SE2d 785) (2024) (citation and punctuation omitted). Troutman argues that Ramonia's testimony shows that counsel did not adequately investigate the evidence, because interviewing Ramonia before trial would have made clear that she could not provide an alibi for Troutman for January 24. But Ramonia did provide some testimony helpful to Troutman, including that Troutman acted normally when he arrived home on January 24, that she had never worked in a place with an incinerator, and that he had never left the state of Georgia (supporting the notion that his statement to Ackey about a California murder was a fabrication). Although Ramonia indicated that police were confused when they took her statement to them to mean that Troutman met her at the bus as usual on January 24, the State's attacks on her credibility may have minimized any weight of her testimony, such that at worst her testimony was not helpful to either the State or Troutman. See id. ("That [the witness] was impeached in some respects does not render the decision to call him objectively unreasonable, especially given that his impeachment may have benefited [the defendant]'s

20

defense by calling into question any unfavorable testimony that [the witness] did happen to give."). Thus, Troutman has not shown that the decision to call Ramonia was itself deficient performance.

To the extent that Troutman is arguing counsel should have presented a more robust alibi defense or a different defense altogether, even if counsel performed deficiently in this regard, Troutman cannot show prejudice. The only evidence admitted at the motion for new trial hearing was the testimony of trial counsel, who testified that Troutman had given him only the names of "Princess and somebody else" as alibi witnesses, without any contact information. Troutman neither called other alibi witnesses at the motion for new trial hearing nor presented a legally acceptable substitute for their direct testimony that would have substantiated any claim that other witnesses' testimony would have been relevant and favorable to his defense, nor did he introduce any other alibi evidence at the hearing. Additionally, Troutman has not offered an alternative strategy to the alibi defense that counsel should have pursued. Therefore, Troutman failed to show that there is a

21

reasonable probability that the result of his trial would have been different had counsel introduced other alibi evidence or pursued a different strategy. See *Babbage v. State*, 296 Ga. 364, 369-370 (5) (a) (768 SE2d 461) (2015); *Green v. State*, 291 Ga. 287, 297-298 (10) (d) (728 SE2d 668) (2012).

(c) Troutman argues that counsel rendered ineffective assistance by failing to object and move for a mistrial when the State in closing referred to graphic photographic evidence that the trial court had excluded. We disagree.

Although the trial court admitted certain photographs of Clemons's body, it excluded a handful of them. In closing argument the State referenced the mutilation of Clemons's penis and photographs that the trial court had ruled inadmissible, saying, "[t]he photographs were so, so disturbing that the [trial] court won't even let us put them in and show you" and that "the photographs were found too graphic, too gory to show you."

"Reasonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for

22

reversal." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020) (citation and punctuation omitted). And where an objection to closing argument may highlight a point made by the prosecutor, failure to object may constitute a reasonable strategic decision. See id. at 365 (6) (b) (iii); *Westmoreland v. State*, 287 Ga. 688, 695-696 (9) (a) (699 SE2d 13) (2010). Here, counsel stated in the motion for new trial hearing that the decision not to object was a "strategic decision." Counsel's decision not to object was not patently unreasonable. The substance of the unadmitted photos of Clemons's body that the prosecutor referenced in closing had been made available to the jury via the introduction of the medical examiner's testimony. The jury already had heard evidence that Clemons had received gruesome injuries to his genital area through the testimony of the medical examiner, who at one point described a photo of the injuries to Clemons's penis, confirming that the photo was "too graphic to show the jury[.]" Therefore, counsel had little to gain by objecting and asking the trial court to instruct the jury to disregard the prosecutor's reference to the excluded photographs, which would

serve only to highlight the severity of Clemons's injuries.

Troutman argues that trial counsel should have sought a mistrial based on the prosecutor's remark. It is true that a trial court has broad discretion to grant a mistrial where in the hearing of the jury a prosecutor makes statements of prejudicial matters that are not in evidence. See *State v. Jackson*, 306 Ga. 626, 629 (1) (831 SE2d 798) (2019) (citing OCGA § 17-8-75). But "[t]he question of whether a remedy for an improper comment during closing argument is sufficient depends on the degree of prejudice created by the comment." Id. at 629 (1). "And assessing that degree of prejudice involves consideration of the weight of the evidence." Id. Here, the degree of prejudice created by the comment was quite low, because the prosecutor merely orally referenced photographs showing injuries that the medical examiner already had described to the jury. And the evidence of Troutman's guilt — including evidence that the defendant threatened the victim before the killing and confessed to two other people after the stabbing — was strong. Because the trial court would have acted within its discretion in denying a motion for

mistrial, the failure of Troutman's counsel to make a motion for mistrial does not establish deficient performance. See *Hill v. State*, 310 Ga. 180, 189-190 (6) (850 SE2d 110) (2020).

(d) Troutman argues that trial counsel rendered ineffective assistance by failing to object and move for a mistrial when the State in closing argument mischaracterized its burden of proof. We agree that counsel performed deficiently by not objecting but conclude that Troutman did not show that his case was prejudiced by this failure.

In her discussion of reasonable doubt, the prosecutor told the jury, among other things:

> Reasonable doubt is not to a mathematical certainty. A reasonable doubt doesn't mean that we have to prove the case to 50 percent. It doesn't mean that that we have to prove our charges to 98 or 100 percent. It doesn't mean that we have to present a certain number of exhibits. It doesn't mean that we provide more evidence than the defense. Reasonable doubt is also not beyond all doubt.

A prosecutor's closing argument that mischaracterizes the burden of proof by suggesting "that proof beyond a reasonable doubt requires something less than proof that leaves a jury with 51 percent certainty is obviously wrong[.]" *Debelbot v. State*, 308 Ga. 165, 167

25

(839 SE2d 513) (2020) (citation and punctuation omitted). The prosecutor's statement to the jury that "reasonable doubt doesn't mean that we have to prove the case to 50 percent" — i.e., less than the far lower standard of preponderance — thus was plainly improper. And "[w]e cannot conceive of any good reason that a competent criminal defense attorney could have to fail to object to such an egregious misstatement of the law." *Debelbot v. State*, 305 Ga. 534, 544 (2) (826 SE2d 129) (2019).

But Troutman has not shown prejudice from this deficient performance. "[A] defendant asserting an ineffective-assistance claim like the one here must show how a prosecutor's particular mischaracterization of reasonable doubt likely affected how a jury weighed the evidence of his guilt under the circumstances of his case (and in doing so, show how objecting to the comments would have created a reasonable probability of a different outcome)." *Scott v. State*, 317 Ga. 218, 226 (2) (c) (892 SE2d 744) (2023). Here, as noted above, the evidence was strong, not "underwhelming" as in *Debelbot*. 308 Ga. at 168. And this case does not present the particular factual

26

scenario in *Debelbot* where two defendants had essentially equal opportunities, and no one else had any opportunity at all, to inflict the fatal injuries, making a reference to being less than 51 percent sure about the defendants' guilt uniquely harmful. See id. Here, the trial court did instruct the jury that the State was "not required to prove the guilt of the accused . . . to a mathematical certainty," which, as in *Debelbot*, may have reinforced the prosecutor's incorrect argument. 305 Ga. at 543-544 (2). But it also correctly instructed the jury at length on burden of proof, presumption of innocence, and reasonable doubt, and also told the jury that the closing arguments were not evidence. Therefore, Troutman has not shown how counsel objecting to the prosecutor's comments would have created a reasonable probability of a different outcome. See *Scott*, 317 Ga. at 224-226 (2) (c) (defense did not establish prejudice from counsel's failure to object to prosecutor's "inadvisable" characterization of reasonable doubt, where the evidence of the defendant's guilt was strong, the prosecutor told the jury that her arguments were not legal instructions, and the trial court instructed the jury accurately

and at length on the burden of proof, presumption of innocence, and reasonable doubt); *Warren v. State*, 314 Ga. 598, 602-603 (2) (a) (878 SE2d 438) (2022) (defense not prejudiced by counsel's failure to object to prosecutor's remark that burden of proof did not mean "to a mathematical certainty, it's not 95 percent, 85 percent," where the evidence was strong and the appellant did not point to anything like the circumstances in *Debelbot* that made the prosecutor's more egregious remark uniquely harmful there); *Draughn v. State*, 311 Ga. 378, 382-384 (2) (858 SE2d 8) (2021) (defense not prejudiced by counsel's failure to object to counsel's remark that reasonable doubt was "not 90 percent or 95 percent" where evidence of guilt was "plainly sufficient" and any error in State's remark was cured by trial court's instructions to the jury). And given that conclusion that the degree of prejudice suffered by the defense was low here, the trial court would have acted within its discretion in denying a mistrial based on the State's characterization of its burden of proof had defense counsel requested one. See *Jackson*, 306 Ga. at 629 (1). Therefore, Troutman has not proven ineffective assistance of

counsel on this basis.

(e) Finally, Troutman argues that counsel rendered ineffective assistance by insisting on a voluntary manslaughter instruction when the primary defense had been alibi. We conclude that Troutman has not shown counsel performed deficiently by requesting such an instruction.

The trial court did charge the jury on alibi, justification, voluntary manslaughter, and mutual combat at Troutman's request, with counsel explaining that the request for a voluntary manslaughter instruction was based on the recorded conversation between Ackey and Troutman, as well as the medical examiner's testimony referring to an "altercation" between Clemons and his assailant. In arguing on appeal that counsel performed deficiently by requesting a voluntary manslaughter instruction, Troutman states that the *defense* had not presented evidence to support a voluntary manslaughter verdict and suggests that an instruction on voluntary manslaughter undermined the alibi defense. But Troutman also describes the alibi defense as "non-viable."

"Whether the potential upside of a charge is worth its costs is a quintessential question of trial strategy." *State v. Mobley*, 296 Ga. 876, 881 (770 SE2d 1) (2015). "Moreover, a strategy that presents alternative defense theories — all of which are better for the defendant than the prosecution theory of the case — generally falls within the broad range of reasonable professional conduct." Id. "More specifically, it ordinarily is not unreasonable for a defense lawyer to seek a charge on voluntary manslaughter as an alternative defense theory in a murder case, in the event that the jury does not accept the primary defense theory[,]" even where it might impair to some extent the principal defense. Id. And although Troutman suggests that counsel at least should have "withdraw[n] the non-viable alibi defense" if counsel elected to pursue a voluntary manslaughter theory, such a complete change of course during the trial may have further undermined counsel's credibility in the eyes of the jury. Thus, it cannot be said that no reasonable lawyer would have asked for the voluntary manslaughter charge, even though providing the jury the option to convict on voluntary manslaughter

might have impaired to some extent the alibi defense. Troutman has failed to carry his burden to show deficient performance.

(f) Troutman also has argued that the alleged errors of counsel caused him prejudice when considered collectively. See *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020). Even considering the effect of counsel's failure to object to the prosecutor's remarks on reasonable doubt combined with the effect of any deficient performance in counsel's failure to raise a different or more robust theory of defense, we conclude that Troutman has not shown prejudice sufficient to order a new trial. The evidence of Troutman's guilt was strong. Moreover, we have concluded that Troutman has shown *no* prejudice from counsel's failure to present a different or more robust defense, given that Troutman introduced no evidence in that respect at the motion for new trial hearing and has not proposed an alternative defense strategy. Troutman thus has failed to establish that the combined prejudicial effect of any deficient performance by counsel requires a

new trial. See *Jackson*, 318 Ga. at 405-406 (1) (h) (cumulative prejudice claim failed in the light of the strength of the evidence against the defendant); *Allen v. State*, 317 Ga. 1, 13 (4) (f) (890 SE2d 700) (2023) (cumulative prejudice claim failed where the appellant did not show prejudice from any of the assumed deficiencies of counsel).

*Judgment affirmed. All the Justices concur.*

Decided December 10, 2024.

Murder. DeKalb Superior Court. Before Judge Parker-Smith.

*Charles H. Frier*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Helen P. Pott, Lenny I. Krick, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Grace G. Griffith, Assistant Attorney General*, for appellee.