NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 28, 2025

S25A0244. PORTER v. THE STATE.

ELLINGTON, Justice.

James Porter appeals his conviction for malice murder in connection with the stabbing death of Deborah Miles.[1] On appeal, Porter contends that the evidence was constitutionally insufficient to support his conviction and that the trial court erred in failing to give his requested charge that the State had to prove his identity as the perpetrator of the crime beyond a reasonable doubt. Because the evidence was sufficient as a matter of constitutional due process and because the trial court did not err in declining to give Porter's

---

[1] The crime occurred on October 8, 2017. On November 6, 2017, a Bulloch County grand jury indicted Porter for malice murder. At a trial from April 9 to April 10, 2019, a jury found Porter guilty. On April 23, 2019, the trial court sentenced Porter to serve life in prison without the possibility of parole. On May 6, 2019, Porter filed a motion for new trial, which he amended with new counsel on October 16, 2023. The trial court denied the motion for new trial, as amended, on June 18, 2024. Porter filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

requested charge, we affirm.

1. Viewed in the light most favorable to the jury's verdict, the evidence presented at trial showed the following. At the time of the crimes, Miles lived in an apartment at 102 South Mulberry Street in Statesboro, Georgia, and was dating Porter. The two had a troubled relationship because of Porter's alcohol abuse. Miles complained to her work supervisor, Della Ward, about her relationship with Porter, saying that she (Miles) was having financial trouble but that Porter "didn't want to do anything but . . . drink and spend his money, and not give her any money to help with the bills." And Porter's sister testified that, on Friday, October 6, 2017, Porter called around 6:50 p.m. and asked her to come pick him up from Miles's apartment because he and Miles "w[ere] arguing" "[b]ecause of his drinking." Porter's sister could not pick him up because she was taking care of her children. In addition, on the morning of October 7, a law enforcement officer found Porter "passed out," smelling of alcohol, at the backdoor of Miles's apartment. Porter told the officer that he "had passed out there after being

2

kicked out."

Forensic evidence also highlighted the troubled nature of Miles and Porter's relationship. In the days leading up to the October 8 murder, Porter and Miles frequently texted each other. At 6:15 p.m. on Friday, October 6, Porter texted Miles, saying "U hate me." Miles responded that Porter was "full of sh*t." Later that night, Porter texted Miles that she didn't love him, and at 7:41 a.m. on Saturday, October 7, Miles responded that Porter "love[d] alcohol." Porter replied, "I lve u." Shortly after 1:00 p.m. on Saturday, Porter texted Miles requesting that she "come home" and call him as soon as possible. Then, at 7:41 p.m. on Saturday, Porter texted Miles that he loved her "so much" that "[his] head is f**k up." Miles responded that he would "get over it." About a minute later, Porter texted Miles that he could not because she was "[his] soul," and Miles replied that alcohol was "[his] soul mate not [her]." At 8:06 p.m. and 8:26 p.m., Porter asked Miles if he could "come 2 [her]." At 8:27 p.m., Miles replied, "No go home. Turning my phone off." Porter, however, persisted with his text messages. At 9:24 p.m. on Saturday, he asked

3

Miles to call him, and at 3:09 a.m. on Sunday, October 8, he texted Miles that he missed her.

On Sunday, October 8, Miles was scheduled to be at work at 6:00 a.m. to relieve her co-worker, Jahzmere Kicklighter, who had worked a shift from 6:00 p.m. Saturday to 6:00 a.m. Sunday. Kicklighter received a text from Miles's phone at 6:34 a.m. Sunday that said, "hi." Kicklighter texted her back but did not get a response. As of 9:00 a.m., Miles had not arrived for work. Kicklighter called Ward, her supervisor, to see if Ward had heard from Miles. Ward had not, and Ward and Kicklighter both called Miles several times but could not get in touch with her. Kicklighter texted Miles at 9:07 a.m., asking her if she was coming to work, and at 9:09 a.m., Miles responded, "I can't make it." Miles called Ward back and, in what Ward described as a "vague sound," said, "Ms. Della, help." Ward said, "hello, hello," but Miles did not answer. Ward did not specify what time this call occurred.

Because Kicklighter was concerned by Miles's failure to come to work and answer her phone calls, she drove to Miles's apartment

4

around 10:30 a.m. and knocked on the door. Miles did not answer even though her car was there. Kicklighter went back around 11:00 a.m. and, again, did not get an answer from Miles. Finally, around 5:30 p.m., Kicklighter called the Statesboro Police Department and asked them to do a wellness check. Two law enforcement officers arrived at Miles's apartment at 5:55 p.m., , and after the landlord brought a key, they entered her residence around 6:21 p.m.

When officers opened the door to Miles's apartment, they saw a large pool of blood "just inside the doorway." They then went to a bedroom and found Miles dead, "laying on the floor face up." She died from multiple stab wounds to her chest and back. Three of the stab wounds, two to the chest and one to the back, caused bleeding into Miles's left and right pleural cavities and into the pericardial sac that surrounds the heart, and one hit the aorta. The medical examiner testified that it would have taken "less than an hour, maybe less than half an hour" for the pleural cavities to fill with blood.

On Sunday morning, October 8, Porter called his work

supervisor, Alexander Ray, three times. Cell phone records show that those calls were made at 8:36 a.m., 9:37 a.m., and 9:45 a.m. Shortly after the last phone call, Porter arrived at Ray's apartment in Statesboro, When Porter came into Ray's apartment, he was "drenched in . . . sweat" and asked to borrow a shirt. Ray gave him one, and the two men began watching television. Porter then told Ray that he had "f**ked up" and said that he had "stabbed her three or four times" and thought he had "killed her." Ray did not know who Porter was referring to. At that point, Ray's children entered the room, and Ray and Porter did not discuss the matter any further. Porter asked Ray if Ray could drop him off in Claxton on his way to church. Ray agreed, and the group left Ray's apartment around 10:45 a.m. Ray dropped Porter off at a gas station in Claxton.

Cell phone records showed that Porter's cell phone called 911 at 5:57 a.m. on October 8. That call lasted six seconds and was disconnected before it was connected to a 911 operator. The cell tower used for that call was located near Miles's house. At trial, Detective Ben Purvis testified about a map created based on records

6

showing which cell phone towers Porter's phone was connected to on the morning of the crimes. Porter's cell phone utilized the same cell tower for both the 5:57 a.m. call to 911 and the 8:36 a.m. call to Ray, and Detective Purvis testified that Porter's phone was "in close proximity" to Miles's home during the 8:36 a.m. call.

Law enforcement officials never recovered Miles's cell phone, and phone records show that it was powered down at 9:31 a.m. on October 8 and never turned back on.

On Monday, October 9, Ray informed law enforcement officials about Porter's confession to him, and Porter was arrested that same day. In a statement to law enforcement officials after his arrest, Porter said that he was at his sister's home in Claxton from Saturday morning, October 7, until Monday morning, October 9. Porter's sister, however, testified that, after speaking with Porter on October 6, the next time she "heard from him" was on the afternoon of October 8. He called her and asked her to pick him up from a convenience store in Hagan, near Claxton. She did so around 5:00 p.m. and took him to her house. In addition, cell phone records

showed that Porter's cell phone utilized a cell tower in Claxton on October 6 around 6:05 p.m. but did not again utilize a cell tower in Claxton until around noon on October 8.

2. Porter contends that the evidence was not constitutionally sufficient to support his conviction for the malice murder of Miles. We disagree.

When evaluating the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether it was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979); *Moore v. State*, 311 Ga. 506, 508 (2) (858 SE2d 676) (2021). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Wilson v. State*, 320 Ga. 766, 768 (911 SE2d 670) (2025) (citation and punctuation

omitted).

Here, when properly viewed in the light most favorable to the verdict, the evidence presented at Porter's trial was sufficient to authorize the jury's verdict on the malice murder count. That evidence showed that Porter had been having disputes with Miles over his drinking habits and his failure to contribute to financial expenses; that Miles kicked Porter out of her apartment on the night of October 6 to 7 because of Porter's drinking; and that Porter was distraught over the prospect of the end of their relationship, saying, in response to the text message from Miles telling Porter that he would "get over" his love for her, that he could not because she was "[his] soul." Moreover, cell phone records showed that Porter was in the vicinity of Miles's apartment at 8:36 a.m., which was shortly before Kicklighter and Ward had difficulty communicating with Miles about her failure to report to work and shortly before her request for help from Ward. In addition, not long after that, Porter arrived at Ray's apartment "drenched in . . . sweat" and confessed to Ray that he had "stabbed [a woman] three or four times" and

thought he had "killed her." Furthermore, in his statement to the police, Porter lied regarding his location at the time of the crimes, saying that he was in Claxton at his sister's residence from Saturday, March 7, until Monday, March 9, when his sister testified that Porter was not in Claxton with her that weekend until late Sunday afternoon on March 8. Phone records confirmed the sister's testimony. We conclude that Porter's confession, coupled with other supporting evidence, was sufficient to authorize the jury's verdict on the malice murder count. See *Troutman v. State*, 320 Ga. 489, 490-492 (1) (910 SE2d 173) (2024) (holding that the defendant's confession to his uncle that he "had just killed someone," along with other supporting evidence, was sufficient to support his malice murder conviction); *Jones*, 319 Ga. at 762 (2) (holding that the defendant's confessions, which were direct evidence of guilt, coupled with other corroborating evidence, were "more than sufficient to support his murder convictions"); *Grant v. State*, 319 Ga. 490, 492-493 (2) (a) (904 SE2d 338) (2024) (holding that the evidence was constitutionally sufficient to support the jury's verdicts, in part,

10

because the evidence showed that the defendant "lied" to officers about her communications with a co-defendant).

Porter complains about the absence at trial of any DNA or fingerprint evidence linking him to the crime scene. "However, the fact that the State did not produce certain types of evidence does not mean that the evidence was insufficient." *Jones v. State*, 319 Ga. 758, 761 (2) (906 SE2d 699) (2024) (citation and punctuation omitted). Indeed, "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." Id. 761-762 (2) (citation and punctuation omitted).

Porter also complains that phone records show that his only chance to have committed the crime would have been around 5:57 a.m. when he called 911 from a location close to Miles's apartment, but that he could not have been the perpetrator because, if he had attacked her at that time the seriousness of her injuries would not have permitted her to text Kicklighter at 6:34 a.m. and 9:07 a.m. or to call Ward around 9:00 a.m. However, there is no evidence that

Miles was attacked at 5:57 a.m. and no evidence regarding why Porter called 911 at that time. Instead, as explained above, the jury could have concluded that Porter was still in close proximity to Miles's apartment closer to 9:00 a.m., that he attacked her around that time, and that he then fled to Ray's apartment where he confessed to the crime. In evaluating the constitutional sufficiency of the evidence, "we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Troutman*, 320 Ga. at 491 (1). In sum, the evidence was sufficient to authorize the jury to convict Porter of the malice murder of Miles.

3. Porter argues that the trial court erred by failing to give his requested charge that the State had the burden of proving his identity as the perpetrator of the crime beyond a reasonable doubt.[2]

---

[2] The current pattern jury charge on the State's burden of proof regarding identification is identical to the charge requested by Porter. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.35.11 (4th ed. 2007, updated 2025). Porter's requested charge was, in part, as follows: "The burden of proof rests upon the State to prove, beyond a reasonable doubt,

The trial court declined to give the charge on the ground that the principle of the requested charge would be covered by other parts of the trial court's charge. We conclude that the trial court did not err.

Porter argues that, by failing to give the requested charge, the jury was not properly informed that the State had the burden of proving his identity as the perpetrator of the crime. However, the record shows that the trial court covered this point of law in other parts of the charge. The trial court charged that Porter was presumed innocent "until and unless [the presumption of innocence] is overcome by the State with evidence that is sufficient to convince you beyond a reasonable doubt of his guilt of the offense" charged in the indictment; that "no person shall be convicted of any crime unless and until each element of the crime is proven beyond a reasonable doubt"; and that the State had the burden "to prove every material allegation in the Indictment and every essential element of the crime charged beyond a reasonable doubt." In addition, the

the identity of this defendant as the person who committed the crime alleged in this bill of indictment."

13

court charged the jury that "facts and circumstance that merely place upon the defendant a grave suspicion of the crime charged or that merely raise a speculation or conjecture of the defendant's guilt are not sufficient to authorize a conviction of the defendant," , and that, to be authorized to find Porter guilty, it had to "find and believe beyond a reasonable doubt that [Porter] . . . commit[ted] the offense of malice murder, as alleged in the Indictment." Because these charges substantially covered the principle that the State had to prove Porter's identity as the perpetrator of the crime beyond a reasonable doubt, the trial court did not err in declining to give the requested instruction. See *Priester v. State*, 317 Ga. 477, 487-488 (4) (b) (ii) (893 SE2d 751) (2023) (holding that the trial court did not err by declining to give a requested instruction on perjury because other parts of the charge, including the charge on the credibility of witnesses, "covered [the perjury] concept"); *Wilson v. State*, 315 Ga. 728, 737 (7) (883 SE2d 802) (2023) (holding that the trial court did not err in failing to give a requested instruction where "the points of law in [the] requested instruction were covered in the court's other

14

instructions"); *Francis v. State*, 296 Ga. 190, 194 (2) (766 SE2d 52) (2014) ("A trial court does not abuse its discretion in refusing to give a jury charge in the exact language requested when the charge given substantially covers the correct principles of law." (citation and punctuation omitted)).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*