**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: September 30, 2025

S25A0530.  GREEN v. THE STATE.

LaGrua, Justice.

Appellant Kendrick Green challenges his convictions for felony murder and possession of a firearm during the commission of a crime in connection with the shooting death of Donnell Graham.[1] Green's sole enumeration of error is that the evidence was wholly circumstantial and insufficient under OCGA § 24-14-6(2). We

---

[1] The shooting occurred on March 10, 2020. On October 27, 2020, a Richmond County grand jury indicted Green, Torjae Tanksley, Kenneth Green ("Kenneth"), and Ashley Jones, for malice murder (Count 1); felony murder predicated on aggravated assault with a deadly weapon (Count 2); and possession of a firearm during the commission of a felony (Count 3). Green, Kenneth, and Tanksley were jointly tried before a jury in October 2023, and Jones testified against them. Green was convicted of felony murder (Count 2) and possession of a firearm (Count 3) and acquitted of malice murder (Count 1). The trial judge sentenced Green to serve life without parole on Count 2 and to serve a consecutive five-year prison term on Count 3. Green timely filed a motion for new trial on November 1, 2023, which he amended through new counsel on June 5, 2024. The trial court denied the motion on September 24, 2024. Green timely filed a notice of appeal, and the case was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

conclude that OCGA § 24-14-6(2) does not apply because the State presented direct evidence. Accordingly, we affirm.

Green was tried with his co-defendants Kenneth Green[2] ("Kenneth") and Torjae Tanksley. A fourth co-indictee, Ashley Jones, who was dating Kenneth, testified against them under an immunity agreement. The evidence presented at trial showed that, on the night of March 10, 2020, Graham was fatally shot as he drove out of the parking lot of the fast-food restaurant in Richmond County where he worked. A few days before the shooting, Jones overheard a phone call between Kenneth and Graham in which the two men argued. Kenneth and Graham each had a child with the same woman, and Kenneth was currently living with the woman. During the phone call, Kenneth told Graham he was going to kill him, he knew where Graham worked, and he knew what time Graham got off work.

On the evening of March 10, Kenneth called Jones, said he

---

[2] The record does not reflect whether appellant Kendrick Green and Kenneth Green are related to each other.

2

wanted her "to go with him to make a play," and asked her to drive him to pick up Green and Tanksley. Kenneth, who was 29 or 30 years old, came to Jones's apartment, and she drove Kenneth to "Lake Olmstead" to pick up Green, who was a high school freshman, and Tanksley, who was 16. According to Jones, Green and Tanksley got in the car, and while they were in the car, Kenneth was "telling the boys, whatever they were going to do, that he gets off at 10." Kenneth asked Green and Tanksley if they were "ready" and were going to "stick to the plan." Green responded, "Yeah," and Tanksley responded, "Yes, we understand. Yes, we got it." Jones also testified that "the boys knew, whatever Kenneth was talking about. Like, they knew what they were going to do." At Kenneth's direction, Jones drove to a gas station and convenience store across the street from the restaurant where Graham worked, arriving about 10:15 p.m. After Kenneth and Tanksley went inside the convenience store and returned to the car, Jones drove "[t]o the side by the carwash," where Kenneth told Green and Tanksley to get out of the car. Green and Tanksley got out of the car and walked across the street to the

3

restaurant where Graham worked, which had just closed. Jones moved her car to another parking lot that had a "view" of the restaurant because Kenneth "[said] he wanted to see the young men."

Although there were no witnesses who saw the shooting, what happened in the restaurant parking lot before and after the shooting was described by three witnesses at trial — a restaurant employee, the girlfriend of a restaurant employee, and the restaurant's manager. Additionally, video footage showing Green and Tanksley in the parking lot was played at trial. Marrissa Jackson, who was working at the restaurant, testified that after the restaurant had closed, she went outside to move her car to the front parking lot because she had learned that two people were "around my car." While in the parking lot, she saw Green and Tanksley, both of whom she knew, standing by her car, which was parked next to Graham's car. After she went back into the restaurant, a co-worker told Graham that "somebody was in his car." Graham then went outside, and when he came back inside, he asked his manager to clock him

4

out and left again. After Graham went outside the second time, Jackson looked out the back door and saw Graham drive his car around the corner to exit through the parking lot of the restaurant next door. As Graham drove around the corner, Jackson heard gunshots. She then saw Green and Tanksley running around bushes back across the parking lot toward the street. Jackson identified Green and Tanksley as the individuals seen on the video footage walking through the parking lot from the street and later, running in the opposite direction.

Aylissia Bussey testified that she drove to the restaurant around 10:25 p.m. to pick up her boyfriend, who worked at the restaurant. She testified she saw two "boys" crossing the road from the gas station to the restaurant. These individuals remained in the parking lot, with one of them pacing and looking "antsy-like," with his hands in his pockets; the other one "looked like he was bothering the cars." Bussey texted her boyfriend that there were two people "messing around" and looking "suspicious." Bussey saw Jackson exit the restaurant and move her car, and then she saw Graham come

5

out. Bussey heard Graham ask the two individuals, who were both by Graham's car at this point, "what they got going on," and one of them responded "they been standing out there." Graham went back inside the restaurant and quickly came back out. The two individuals, who had been standing by the cars, had moved to another area where there were large bushes separating the parking lot from the restaurant next door. When Graham came back outside, he got in his car and "drove around really fast," at which point Bussey heard gunshots. Although Bussey did not know Green or Tanksley, she testified that the individuals she saw in the parking lot that night were the two individuals seen on the video footage walking across the restaurant parking lot. Jackson and Bussey did not see any people in the parking lot other than Green and Tanksley and restaurant employees taking out the trash.

The manager of the restaurant where Graham worked testified that she heard another employee tell Graham that there were "two little boys by your car," that Graham went outside, and then he came back inside and asked her to clock him out. After she did so, she went

6

outside and saw two young men by Graham's car. As Graham drove toward the exit, she heard gunshots. At the sound of gunshots, other employees had started to come out of the restaurant, and the manager started running to get everyone inside, at which point she saw the two young men running away from the area from which the gunshots came. She did not see anyone else running away before or after the gunshots. She identified the two men she saw standing by Graham's car, and later running away, as the two men seen on the video footage walking across the restaurant parking lot. A few minutes later, the manager went outside and saw Graham slumped over in his car, which had come to rest on the curb of the restaurant next door.

Jones, who had remained in her car with Kenneth nearby, heard the gunshots. After hearing the shots, Kenneth directed Jones to drive down the street and told her to stop when he saw Green and Tanksley. Jones stopped the car, and Green and Tanksley got in. Green was "breathing kind of hard," and Tanksley was "throwing up." Kenneth asked Green and Tanksley if they "handled that," to

which both Green and Tanksley replied, "Yes." Jones drove the group to her house. Kenneth asked Jones for a T-shirt and then drove Green and Tanksley back to Lake Olmstead. Kenneth returned to Jones's apartment, and later that night, he asked her to drive him to his house. On the way, he asked her to go down to the end of one particular street and to pull over "on the side of the sewer." At that point, Kenneth got out of the car and placed a bag in the "sewer" and told Jones that there were clothes in the bag. A few days later, when Kenneth was at Jones's house, he noticed police officers driving past her apartment building and told her, "We need to leave." A few minutes later, after Jones and Kenneth had left her apartment, one of Jones's neighbors called her and told her police officers were at her door with a search warrant. Jones asked Kenneth why police were at her door, and in response, he pulled up a news article on his phone about the shooting of Graham, reminded her of the night she had given him, Green, and Tanksley a ride, and said "I off'd him." Kenneth then told Jones to drive to "the swamp" off "I-520," and when they arrived, Kenneth got out of the car, took

8

a gun out of the back seat, and threw it into the swamp.

Law enforcement officers arrived at the scene of the shooting within "approximately five minutes" after an emergency call was placed about the shooting. Officers found four 9mm shell casings and determined that four bullets struck Graham's car. A crime scene technician testified that all four shots entered the vehicle from the rear passenger's side, and the technician's reconstruction of the bullets' trajectories indicated that "[t]he shooter in this particular case was on the back passenger side shooting towards the vehicle as it was passing." The medical examiner recovered two bullets and several bullet fragments from Graham's body, determined that Graham was shot four times, and concluded that the cause of death was multiple gunshot wounds. A Richmond County Dive Team twice searched "the brickyard ponds near I-520" at the request of law enforcement officers but did not recover a handgun.

1. Green contends that the evidence of his guilt was entirely circumstantial and did not exclude the reasonable hypothesis that he abandoned the plan to kill Graham. Green relies on OCGA § 24-

14-6, which provides that a conviction that rests only on circumstantial evidence cannot stand unless the evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused."[3] However, "this statute only applies when the State's case against the defendant is wholly circumstantial" and does not apply "if there is *any* direct evidence presented by the State." *Douglas v. State*, 321 Ga. 739, 747 (2025) (quotation marks omitted).

This case was not a "wholly circumstantial" evidence case. Direct evidence includes a defendant's admissions and testimony about those admissions. See *Walker v. State*, 314 Ga. 390, 394 & 394 n.6 (2022). See also *Troutman v.* State, 320 Ga. 489, 492 (2024) (holding that testimony about a confession Troutman made to an uncle was direct evidence of guilt). Here, Jones testified about admissions Green made on the way to the restaurant and when

---

[3] Green does not contend that the evidence was insufficient as a matter of constitutional due process, so we address only the claim he asserts under OCGA § 24-14-6. See *Scoggins v. State*, 317 Ga. 832, 837 n.6 (2023).

Green returned to the car after the shooting. Specifically, Jones testified that before the shooting, Kenneth told Green and Tanksley "whatever they were going to do, that he gets off at 10," and Green said he was "ready" and agreed to "stick to the plan." Then, after getting into the car immediately after the shooting, Green responded, "Yes," when asked by Kenneth if he had "handled that." At a minimum, Green's post-shooting statement, in which he admitted he had "handled" the task — shooting Graham, is direct evidence. See *Walker*, 314 Ga. at 393–94 (holding that defendant's admissions were direct evidence and explaining that an admission is "a mere incriminating statement" (citation omitted)); *Bowen v. State*, 181 Ga. 427, 429 (1935) ("An admission of participation in a shooting which resulted in the death of another person is to be taken as direct, and not as mere circumstantial evidence."). See also *English v. State*, 300 Ga. 471, 474 (2017) (explaining that admissions are "mere incriminating statement[s]" in which "only one or more facts entering into the criminal act are admitted" (cleaned up)); *Brown v. State*, 251 Ga. 598, 599, 601 n.3 (1983)

11

(noting that there was direct evidence when a witness testified that the defendant told him "I got tired of the brother … I had to do what I had to do … I had to go Philly on him"). Because the State presented direct evidence of Green's guilt, OCGA § 24-14-6 does not apply, and thus, Green's sole enumeration of error fails. See *Walker*, 314 Ga. at 393–94 (holding that we need not address whether evidence satisfied OCGA § 24-14-6 where State presented direct evidence, which included defendant's admissions).

*Judgment affirmed. All the Justices concur.*